David Jay BROWN, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–89–22.

Court of Criminal Appeals of Oklahoma.

Feb. 15, 1994.

Rehearing Denied March 30, 1994.

Chris Box, Oklahoma City, Trial Counsel, Thomas E. Salisbury & Anne M. Moore, Asst. Appellate Public Defenders, Norman, Appellate Counsel, for appellant.

Melvin Singleterry, Dist. Atty., Chickasha, Trial Counsel, Robert H. Henry, Atty. Gen., David Walling & A. Diane Blalock, Asst. Attys. Gen., Oklahoma City, Appellate Counsel, for appellee.

*OPINION*

LUMPKIN, Presiding Judge:

Appellant David Jay Brown was tried by jury and convicted of Murder in the First Degree (21 O.S.Supp.1982, § 701.7), Case No. CRF–88–45, in the District Court of Grady County. The jury found the existence of one aggravating circumstance, the existence of a probability Appellant would commit criminal acts of violence that would constitute a continuing threat to society (21 O.S.1981, § 701.-12(7)), and recommended death as punishment. The trial court sentenced accordingly. From this judgment and sentence Appellant has perfected this appeal. We affirm.

The murder of Eldon McGuire was discovered on February 20, 1988, when his daughter Lee Ann McGuire, received word he could not be contacted by telephone. The decedent had telephoned his wife, who was a patient in a local hospital, between 7:30 and 7:45 the evening before. He told her he was tired and would visit her the next morning.

Lee Ann and Eldon's mother arrived at his house, forced entry through the front door, and discovered the decedent lying in the south end of the living room. Authorities found a cordless telephone in the kitchen area. They also found in the kitchen some meat and cheese unwrapped and uneaten; it appeared the decedent was preparing to eat his evening meal. Appellant was formerly married to Lee Ann, and blamed the decedent for a multitude of problems in his life. He was arrested in Louisville, Kentucky, on March 3, 1988. As he has alleged insufficiency of the evidence in his first proposition, the evidence will be discussed in more detail below.

## I. ·ISSUES RELATING TO JURY SELECTION/PRE–TRIAL

### A.

■ In his eighth proposition of error, Appellant contends this Court must reverse his conviction because the trial court erred in failing to grant a change of venue. The issue is not properly before this Court, as Appellant failed to comply with 22 O.S.1981, § 561, which requires a motion for change of venue to be accompanied by three affidavits. It is thus waived, *Shultz v. State,* 811 P.2d 1322, 1329 (Okl.Cr.1991); *Stafford v. State,* 669 P.2d 285, 290 (Okl.Cr.1983), *vacated and remanded on other grounds,* 467 U.S. 1212, 104 S.Ct. 2652, 81 L.Ed.2d 359 (1984).

■ Furthermore, we find no fundamental error. Appellant claims this Court has adopted a "virtual impossibility test" which makes a change of venue very difficult to achieve. We have held that before relief can be granted, an appellant must show by clear and convincing evidence that a fair trial was "virtually impossible" at the venue where it was held. *See Brecheen v. State,* 732 P.2d 889, 893 (Okl.Cr.1987). After reviewing past caselaw, we agree the words "virtually impossible" are inappropriate, but do not feel it affects his case.

The words "virtual impossibility" seem to first surface in *Thomsen v. State,* 582 P.2d 829 (Okl.Cr.1978). A reading of that case reveals the word "impossible" comes first

from the assertions of that appellant that it was "impossible to empanel a jury which did not have a fixed opinion concerning this case." *Thomsen*, 582 P.2d at 832. This Court responded in kind:

This Court has held previously that a change of venue on the ground that a fair trial cannot be had in the district where the actions is pending is warranted only where it is shown that the inhabitants of the district are so prejudiced that a fair and impartial trial for the defendant in that district would be impossible.

*Id.* The case cites *Mooney v. State*, 273 P.2d 768 (Okl.Cr.1954) and *Wininegar v. State*, 97 Okl.Cr. 64, 257 P.2d 526 (1953) in support of its language. However, the word "impossible" is not found in either of those cases. We believe the more traditional and most accurate statement of the law is found in *Wininegar*, where this Court held

On application for a change of venue, the affidavit of the defendant in support thereof must not only aver "that the minds of the inhabitants of the county in which the cause is pending are so prejudiced against the defendant that a fair and impartial trial cannot be had therein," but it must also set forth the facts rendering a fair and impartial trial there improbable.

*Id.* at 68, 257 P.2d at 531 (quoting *Starr v. State*, 5 Okl.Cr. 440, 115 P. 356 (1911)). This is the correct test. *Thomsen* and other cases using the wording "virtual impossibility" are hereby overruled to the extent they conflict with the "improbable" wording found in *Wininegar* and *Starr*.

■ We still believe there is a rebuttable presumption an accused can receive a fair trial in the county where the offense occurred. *Shultz*, 811 P.2d at 1329. Appellant does not contest the standard by which this evidence must be proved, and we believe our earlier holdings are correct that the burden of persuasion still lies with the accused to present evidence that shows by clear and convincing evidence, *Brecheen*, 732 P.2d at 893, "that the minds of the inhabitants of the county in which the cause is pending are so prejudiced against the defendant that a fair and impartial trial cannot be had therein." The appellant in doing so must set forth the

facts "rendering a fair and impartial trial there improbable." *Wininegar*, 97 Okl.Cr. at 68, 257 P.2d at 531.

■ Here, the record contains nothing to show such a prejudice, nor does it show a pervasiveness of the media in the proceedings which may give rise to a presumption of prejudice. *See Murphy v. Florida*, 421 U.S. 794, 798–99, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975). A transcript of the voir dire shows some members of the panel had read articles about the murder in the Chickasha newspaper; but nothing shows that anyone on the jury was so influenced by the articles he or she could not render Appellant a fair and impartial trial. There is no fundamental error present here, and this proposition is without merit.

## B.

■ Appellant complains in his seventh proposition of error the court erred in not excusing a prospective juror for cause. The juror, Allen Huffines, was a client of Mike Bradford, a barber who testified in the sentencing stage of Appellant's trial. Appellant claims the prospective juror should have been excused for cause, as he had talked with Bradford about an incident in the beauty shop during which Appellant brandished a weapon and shot an empty chair. The evidence was used to support the continuing threat allegation, and is discussed more fully below.

When asked whether Mr. Bradford had related the incident to him, Mr. Huffines said "He just—I really don't remember. Seemed like he said something about it." When asked further whether he had a conversation with the barber, Mr. Huffines said "I really don't remember. I remember what was in the paper more than anything." When asked if Mr. Bradford had been present during the incident, he replied: "Yes. I think that's what the newspaper said" (Tr. 56). He added Mr. Bradford "really didn't say much about it," adding it would not affect his consideration in the case at all (Tr. 57). He also said he would not give Mr. Bradford's testimony any more weight (Tr. 59).

■ This Court has held that a court does not abuse its discretion simply because a juror may be acquainted with a witness if the juror says it would not affect his ability to be impartial. *Bass v. State*, 733 P.2d 1340, 1341 (Okl.Cr.1987). Nor is it an abuse of discretion to leave on a juror who has read something about the incident in question, so long as the juror can put that information aside and act fairly and impartially on the matter submitted to him. 22 O.S.1981, § 662; *see also Nauni v. State*, 670 P.2d 126, 130 (Okl. Cr.1983). We see no merit to this proposition.

### C.

In his nineteenth proposition of error, Appellant urges reversal of his conviction because the method of venire panel selection systematically excludes as jurors those who choose not to obtain driver's licenses, and provides those over 70 years of age have the option of declining jury service. We find no merit to this proposition.

We previously addressed the complaint arising from the ability of citizens over 70 years of age to decline to serve if they so desire, and see no need to revisit that. *Fox v. State*, 779 P.2d 562, 566 (Okl.Cr.1989), *cert. denied*, 494 U.S. 1060, 110 S.Ct. 1538, 108 L.Ed.2d 777 (1990); *Moore v. State*, 736 P.2d 161, 165 (Okl.Cr.1987), *cert. denied*, 484 U.S. 873, 108 S.Ct. 212, 98 L.Ed.2d 163 (1987).

■ Concerning the complaint arising from the selection of those with driver's licenses, we continue to adhere to the test enunciated in *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), that to show a prima facie violation of the fair cross-section requirement, an appellant must show (1) the group alleged to be excluded is a "distinctive" group in the community; (2) the representation of this group in venires is not fair and reasonable in relation to the number of such persons in the community; (3) this underrepresentation is caused by systematic exclusion of that group in the jury selection process.

■ The Supreme Court has never defined the term "distinctive group." However, we see merit in the three-prong test enunciated in *Ford v. Seabold*, 841 F.2d 677 (6th Cir.1988). While we do not find the federal appeals court's definition to be a binding precedent on this Court, we find the analysis helpful in assisting us in determining a "distinctive group":

(1) that the group is defined and limited by some factor (*i.e.*, that the group has a definite composition such as by race or sex); (2) that a common thread or basic similarity in attitude, ideas or experience runs through the group; and (3) that there is a community of interest among members of the group such that the group's interests cannot be adequately represented if the group is excluded from the jury selection process.

*Id.*, 841 F.2d at 682. Appellant here has not alleged a distinctive group as determined by these three factors has been systematically excluded based solely on their lack of a license. *See Fox*, 779 P.2d at 566 (dealing with complaint that previous method of selection—from a voter registration list—caused systematic exclusion of persons from the cross-section requirement). This proposition is without merit.

## II. ISSUES RELATING TO GUILT–INNOCENCE

### A.

■ For his first proposition of error, Appellant claims the evidence was insufficient to show he committed the crime of first degree murder. Specifically, he claims the evidence did not show premeditation. Since this case presents both direct and circumstantial evidence, we will review it in the light most favorable to the State to determine whether any rational trier of fact could find the elements of the crime charged beyond a reasonable doubt. *Spuehler v. State*, 709 P.2d 202, 203–04 (Okl.Cr.1985). In reviewing this evidence, this Court must accept all reasonable inferences and credibility choices that tend to support the verdict of the trier of fact. *Curtis v. State*, 762 P.2d 981, 982 (Okl.Cr.1988). We find that, viewed in the light most favorable to the prosecution, the evidence is sufficient.

The evidence here indicates the death arose from an ongoing family conflict. Appellant and his ex-wife, Lee Ann McGuire, had a short, stormy marriage surrounded by a generally tempestuous relationship. The decedent, Lee Ann's father, never approved of the relationship, and did not like Appellant, nor did Appellant like him. The situation became more serious when at one point after the marriage was terminated, Appellant walked into the hair styling shop where Lee Ann worked. He was carrying a rifle, and during an argument with Lee Ann fired the weapon into a vacant barber chair. There were several people in the shop at the time. Appellant was arrested and charged with several criminal counts as a result of the incident. Appellant thought the charges were manufactured by the decedent, who was a retired captain with the Chickasha Fire Department and who Appellant believed was very influential with law enforcement officers. Believing the charges were bogus charges and believing he would get a long prison term, Appellant absconded while on bail and fled the jurisdiction.

A little over a year later, Appellant returned to the area. He did not surrender to authorities, but called Lee Ann to see if she would consent to dismissing the charges. She refused. He became angry, telling Lee Ann he had left a message in the wood pile at her parent's house and they would all be sorry. An obscene message was found in the woodpile. In addition, he accurately described to Lee Ann the actions of her and her parents at the house on a particular night, indicating he had been watching the house.

Appellant and the decedent had at least one previous physical confrontation. Appellant had also called the decedent's house less than a month before the homicide. As the decedent's wife picked up an extension, she heard Appellant tell the decedent "you all's time is up," and they would pay for what they had done to him. A friend of Appellant's talked with Appellant a month or two before the homicide. Appellant blamed the decedent for his legal troubles, believing the decedent wielded undue influence over Lee Ann. When the friend asked Appellant if there was anything he could do to help,

Appellant asked the friend to beat up the decedent. In the context of the conversation, the friend did not know whether Appellant was serious. Appellant's ex-wife, Connie, heard Appellant say he would like to beat up the decedent. He possessed a handgun at the time he made the statement. He seemed frustrated at the time he made the statement.

Jerry Clark, a man Appellant met while he was outside Oklahoma, returned temporarily with Appellant to the area in January and February 1988. During this period, he heard Appellant say he would like to get intoxicated and kill the decedent, as he had cost Appellant everything he owned. Appellant also said he did not care if the whole family were dead. Clark returned to Louisville, Kentucky, on February 16. Appellant returned there on February 21, a Sunday. Appellant told Clark he and the decedent "had it out" and Appellant got even. He said he had gone to the decedent's house, and left him on the floor.

When they first arrived in January, Appellant and Clark acquired a room in an El Reno motel, where they stayed for approximately a week. El Reno is north of Chickasha approximately 40 miles. Appellant checked back into the same motel on February 16. Although he paid for the room through February 23, he left the motel on February 19, the day of the homicide, and did not return.

We believe this evidence is adequate to show premeditation. Taken in the light most favorable to the prosecution, the physical evidence at the scene negates Appellant's theory of self-defense.

Appellant admitted going to the decedent's house, claiming he did so to convince him to change his mind about the charges. He claims the decedent allowed him to enter the house, then hit him from behind, knocking him down. The decedent then kicked him and told him he would kill him. At one point the decedent kicked at Appellant and missed, striking the bedroom door. As Appellant ran for the front door to exit the house, the deceased fired a shot at him, at which time Appellant pulled from his back pocket a loaded 9 mm. semiautomatic pistol and began

firing blindly at the decedent. He said he fired until the gun was empty, firing approximately 18 times in two or three seconds.[1] He then went back to El Reno for his clothes, then drove to Louisville.

Authorities found the decedent partially curled up in front of his bathroom and near a wall heater on the south end of his living room. They found heel marks on a bedroom door across the room, and paint matching that on the door on the decedent's boot heel. They found several 9 mm. casings around the living room sofa and others in other spots around the room. Three slugs were found in the open: one on the floor near a chair, one between the decedent's feet and one on some nearby clothing. There were nine bullets in the lower portion of the wall behind the body similar to the ones lying in the open. In the northeast corner of the living room authorities found embedded in a wall a copper-jacketed bullet and fragment not consistent with the others found. That path where that bullet found was consistent with an entry and exit hole in the corner of a television set and a shattered oil lamp globe which had been standing next to the television. A lever-action rifle was found in the middle of the room; one shot had been fired from it. The lever action was partially pulled down, but not far enough to eject the spent casing in the chamber. Four live, copper-jacketed rounds were found inside the rifle. Blood was also found on the rifle, as was a small dent, as if something had ricochetted off the rifle.[2]

The decedent suffered a severe gunshot injury to the index, middle and ring finger of his left hand which in the opinion of the medical examiner would have rendered him incapable of using it. A man's gold ring was found in the living room; it had been badly damaged. The medical examiner found seven additional gunshot wounds to the body and two to the head. A wound on the left shoulder bore evidence of stippling, indicating the weapon causing the injury was fired at intermediate range. A firearms expert with the Oklahoma State Bureau of Investigation performed tests on a handgun taken from Appellant, and concluded the weapon would have left stippling if it were fired from a distance of less than 30 inches.

Both entry wounds in the head indicated shots had been fired from relatively close range. One was surrounded by stippling, indicating intermediate range. The other wound had gunpowder residue inside the wound itself. The medical examiner concluded this could only come from a "hard contact wound," meaning the barrel was pressed against the scalp itself when the weapon was fired. Appellant testified he got no closer than two or three feet from the decedent during the brief struggle.

We believe the position of the bullets found at the scene disproves Appellant's self-defense theory. Despite Appellant's claims he shot the decedent only to preserve his own life and did not intend to kill him, he did not seek help for the decedent after the shooting. Instead, he ran out the door, apparently locking it behind him. He testified on direct examination he took the weapon with him because he did not know what would transpire at the house; however, he said on cross-examination he intended to use the weapon if he had to. Despite Appellant's claim he did not get closer than two feet to the decedent while firing, one head wound shows the gun barrel was pressed against decedent's head when the gun was fired. Most of the bullet holes were fired into the west wall and corner of the short hallway. State's exhibits 9, 10 and 11 are photographs of the scene. They show that corner of the

---

1. It is important to note the pistol is a semiautomatic pistol. The firearms expert testified at trial a separate pulling on the trigger is required to fire each round (Tr. 777). We think it unlikely any normal person could fire such a weapon 18 times in two or three seconds; and in any event, a person could not simply "[freeze] down on the trigger of a semiautomatic pistol and discharge all of the rounds in the clip," as Appellant claims in his reply brief. The mechanics of the weapon make this impossible.

2. This information is obtained from the transcript and other evidence admitted during the trial. During oral argument, Appellant used during argument a diagram of the decedent's residence, showing the location of several items. However, since the exhibit was not admitted at trial, it was not properly before this Court, and is not being used by this Court in its deliberations.

hallway cannot be seen from the front door area, as it is blocked by a wall heater, which did not exhibit any signs of being fired at. We agree with the State that had Appellant been running toward the door while firing as he claimed he did, his line of fire would have been blocked by this wall heater, which would have blocked the bullets found in the lower wall behind the body.

We believe this evidence is sufficient. While the Court has "a duty to assess the historical facts when it is called upon to apply a constitutional standard to a conviction obtained in a [trial] court," "this inquiry does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979) (citations omitted) (emphasis in original). In this light we find the evidence supports both the presence of premeditation required for first degree murder and the absence of self-defense. *Spuehler*, 709 P.2d at 203–04; *Quilliams v. State*, 779 P.2d 990, 992 (Okl.Cr. 1989); *Curtis*, 762 P.2d at 983. This first proposition is without merit.

### B.

■■■ In his sixth proposition of error, Appellant alleges error in allowing the district attorney's investigator to give his opinion where the decedent was standing when he was shot. Investigator Junior Turner testified a bullet, later determined to be from the rifle the decedent apparently had been holding, had gone through a corner of the television set at an angle of approximately nine degrees. From this Turner extrapolated the approximate location the decedent would have been standing when the shot was fired and the approximate angle of the shot.

We first observe Appellant interposed no objection to the testimony, thus waiving consideration on appeal. *Moore v. State*, 788 P.2d 387, 898 (Okl.Cr.App.1990). We see no error here. Turner testified as to what he saw, and the testimony was helpful to the trier of fact. 12 O.S.1981, § 2701. *Hall v. State*, 751 P.2d 1091, 1093–94 (Okl.Cr.1988); *Lee v. State*, 661 P.2d 1345, 1354 (Okl.Cr. 1983). Further, the trajectory of the bullet could be gathered from other evidence at trial, including the picture showing the position of the television set, the scratches on the wall made by the bullet and the location the bullet entered the wall. This proposition is without merit.

### C.

■■■ In his ninth proposition of error, Appellant claims the trial court erred in failing to give *sua sponte* an instruction on second degree murder. We disagree, as the evidence does not warrant giving such an instruction under the fact situation in this case. *Crumley v. State*, 815 P.2d 676, 678 (Okl.Cr.1991).

The evidence presented by the prosecution amply supports the first-degree murder theory. There was no evidence Appellant's acts were imminently dangerous but without any premeditated design. 21 O.S.1981, § 701.8; *Foster v. State*, 714 P.2d 1031, 1040 (Okl.Cr. 1986), *cert. denied*, 479 U.S. 873, 107 S.Ct. 249, 93 L.Ed.2d 173 (1986).

### III. PROSECUTORIAL MISCONDUCT

In his fifth proposition of error, Appellant alleges numerous instances of prosecutorial misconduct. He first complains the prosecutor introduced inadmissible other crimes evidence: his killing of Lee Ann's puppy, an incident involving a bulldozer; and a telephone call during which he made a sexual proposition to Lee Ann's mother.

■■■ The bulldozer incident Appellant complains of consisted of the prosecutor's asking Lee Ann what had happened during that incident. She began her answer, but was not allowed to complete it before defense counsel objected and the court sustained the objection. There was no evidence of a crime or even a bad act placed in evidence before the jury. Therefore, any bad act was apparent only to Appellant. *See Nuckols v. State*, 690 P.2d 463, 470–71 (Okl.Cr.1984), *cert. de-*

*nied,* 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985).

 Appellant failed to object to the incident where he shot Lee Ann's puppy. He has thus waived the objection for all but fundamental error. *Moore v. State,* 788 P.2d 387, 398 (Okl.Cr.1990). In light of the overwhelming evidence, any error which may have occurred is not of a fundamental nature.

 Counsel objècted to a comment by Lee Ann's mother she had seen Lee Ann after Appellant "had worked on her"; however, counsel stated as the basis for objection the answer was not responsive to the question. He did not complain it was improper under 12 O.S.1981, § 2404(B), the reason he now gives on appeal. Counsel objected to the incident in which Appellant made a telephone call to the decedent's mother on grounds of relevance instead of section 2404. He has thus waived for appellate review both these instances. *Mann v. State,* 749 P.2d 1151, 1156 (Okl.Cr.1988), *cert. denied,* 488 U.S. 877, 109 S.Ct. 193, 102 L.Ed.2d 163 (1988). Again, we see no fundamental error.

 Concerning the complaint the prosecutor asked Appellant on cross examination if he had ever asked Lee Ann's mother on the telephone if she wanted to have oral sex with him, the court sustained defense counsel's objection. However, although it was preserved for appellate review, we find no reversible error in light of the overwhelming evidence against Appellant. *Kelsey v. State,* 744 P.2d 190, 192 (Okl.Cr.1987).

 In another subproposition Appellant urges error occurred when the prosecutor attempted to interject hearsay statements made by Appellant's mother, Bobbie Mask. The prosecutor called Inez Baker, who remembered virtually nothing about anything. He attempted to impeach her through statements she had given the Oklahoma State Bureau of Investigation, in which she told the agents Appellant's mother was crying and Appellant planned to kill five people. We first note Appellant did not lodge a timely objection, waiting until several questions later before objecting on the grounds the question had been asked and answered. He has thus waived consideration on appeal for all

but fundamental error. *Mann,* 749 P.2d at 1156; *Woods v. State,* 762 P.2d 987, 989 (Okl.Cr.1988). While we consider the comments error, we do not believe they require reversal here. Ms. Baker denied making the comments; however, Appellant himself had indicated to Jerry Clark he did not care if the whole family were dead. The decedent's wife overheard him tell the decedent "you all's time is up," and they would pay for what they had done to him. He told Lee Ann they would be sorry for what they had done. In light of this evidence showing threats to more than one person, we find no fundamental error.

 In a related matter, Appellant claims prosecutorial misconduct in questioning Ms. Mask. Specifically, he claims error occurred when the prosecutor asked Ms. Mask where she lived. At the time of trial, Ms. Mask was in custody of the Department of Corrections. He claims this conduct discredited his mother as a possible witness for mitigation; that it shows Appellant came from a family of criminals; and it was the deciding factor in Appellant's decision not to be present during the sentencing stage of the trial.

We find no merit to any of these unsupported allegations. There is absolutely no evidence in the record Appellant even intended to call Ms. Mask in the second stage of the trial, and he has presented none on appeal. Likewise, although Appellant said he did not want to see "my kids and family down there testifying" in the second stage (Tr. 919), there is no evidence he had his mother in mind when he made the statement. Indeed, one of the children intended to testify, but could not because he was upset (Tr. 949–50); Appellant's sister testified, as did a former stepfather and the uncle of Appellant's first wife. We find no evidence to support Appellant's assertion on appeal he had his mother in mind when he made the statement to the court. Nor do we find the information showed Appellant came from a family of criminals. These same family witnesses who testified in the second stage showed that was not true. In the absence of an objection, we find error, if any, to be harmless.

He claims the prosecutor in the second stage insinuated his witnesses were lying. We disagree. The prosecutor observed the witnesses were for the most part family witnesses, adding "you have observed their demeanor on the stand and I don't think, ladies and gentlemen, that you can conclude from what they said that there is sufficient mitigating evidence that should outweigh the aggravating circumstance which we've shown...." We think the statement was more a comment on the sufficiency of the evidence than a comment the people who produced that evidence were lying. *See Jones v. Butler*, 864 F.2d 348, 360 (5th Cir. 1988).

Containing even less merit is Appellant's argument the prosecutor injected sympathy into his closing argument. The prosecutor said:

And their list of mitigating circumstances which the Judge said you can consider, they want you to consider the fact that this defendant is a father of two children, that he has a family and friends that love him, and that he came from a broken home.

Now, ladies and gentlemen, those mitigating circumstances can describe several people in this courtroom. Two children, have friends and family that love him and came from a broken home. And I submit to you, ladies and gentlemen, that having been the fact you've got two children and you've got friends and family that love you, the fact that you came from a broken home is not sufficient mitigation to outweigh the aggravating circumstances of being a probability that the defendant will commit crimes of violence in the future and continue to be a threat to society.

(Tr. 963). We do not see this in any form as a means of invoking sympathy for the victim. Even if Appellant had objected to this comment, we see no error here. *Jones v. Butler*, 864 F.2d at 360.

Appellant complains the prosecutor improperly argued what he labels the "lay-in-wait" and "bullet-in-the-head" theories during closing argument. The gist of these theories is that Appellant hid in the bedroom at the home before the decedent arrived, thus explaining why the bedroom door was kicked in; and that Appellant approached the decedent after he had shot him, to deliver two bullets to the head. Without passing judgment on the strength of either theory, we believe sufficient evidence existed to allow a prosecutor to comment on it. *Romano v. State*, 847 P.2d 368, 380 (Okl.Cr.1993); *Clayton v. State*, 840 P.2d 18, 29 (Okl.Cr.1992).

Another portion of the closing argument is the basis for Appellant's complaint in a supplemental brief the prosecutor argued facts not in evidence. We will address only for fundamental error, as we note this portion of the proposition is not properly before the Court. It was raised in a supplemental brief, which is "intended to be limited to supplementation of recent authority bearing on the issues raised in the brief in chief, or on issues specifically directed to be briefed as ordered by this Court." *Castro v. State*, 745 P.2d 394, 404 (Okl.Cr.1987), *cert. denied*, 485 U.S. 971, 108 S.Ct. 1248, 99 L.Ed.2d 446 (1988) (quoting Rule 3.4(F), *Rules of the Court of Criminal Appeals*, 22 O.S.1991, Ch. 18, App.). *See also* Rule 9.3(D) (supplemental brief "shall only supplement authorities cited in the previous briefs"). Consequently, the proposition has been waived on appeal.

We find no fundamental error. While the prosecutor did argue as fact evidence he was unsuccessful in getting in because his witnesses had memory lapses and denied making earlier statements, the prosecutor also prefaced his remarks with the comment that sometimes he did not hear testimony just right, and if he made a mistake in recalling the evidence, the jury should use its own recollection and not rely on his version. While this does not cure the error, it prevents it from mandating a new trial, especially in the absence of an objection to allow the court and prosecutor to correct the mistake. Although the prosecutor in a couple of instances cross-examined a defense witness in the second-stage with the same material, the witness remained adamant in his opinion Appellant would not be a threat to society if he were allowed to live. We see no reversible error here.

This proposition is without merit.

## IV. ISSUES RELATING TO PUNISHMENT

### A.

Appellant contends the trial court committed fundamental error in refusing to force him to remain in the courtroom during second-stage proceedings. In this, his second proposition of error, Appellant asks this Court to modify his sentence of death because he asked the court to allow him to be absent when evidence was presented in the penalty phase. We will first address Appellant's contention his right to be present during trial cannot be waived.

■ Appellant admits this Court has held in non-capital cases a defendant can waive his right to be present during trial. *See Clark v. State,* 718 P.2d 375, 377 (Okl.Cr. 1986) (second-degree murder); *Parker v. State,* 556 P.2d 1298, 1302–04 (Okl.Cr.1976).[3] However, he claims this Court should hold differently in a capital case. We disagree.

■ It is long established a defendant in a capital case can waive rights that can not otherwise be taken from him. *See, e.g., Opinion of the Judges,* 70 Okl.Cr. 83, 104 P.2d 726, 732 (1940) (can waive right to jury trial even in capital cases). This Court has indicated the right to be present during all portions of the trial may be waived even in capital cases:

> As a general rule, a defendant on trial for a felony must be present throughout the trial, and is not permitted to waive his presence. This requirement is for the benefit of the defendant that he may be accorded his constitutional and statutory rights, and it is said to be against public policy, and contrary to the dictates of humanity, to permit an accused to waive the

advantage his presence may afford him. There are, however, exceptions to the literal enforcement of his right under all conditions. Thus it is generally held that, where the jury during a criminal case is permitted to view the scene of the crime, although such view is a part of the trial, and is the taking of evidence, the presence of defendant is not essential. Many authorities are cited in support of this exception. A great many of the states hold in effect that in a case not capital, if the defendant has been released on bail, and absconds, or is voluntarily absent after his arraignment and plea, the trial may proceed, and the verdict be received in his absence. *Numerous authorities also hold that a temporary absence from the courtroom for a short time during the trial, even in a capital case, is not such an invasion of a defendant's rights as to be ground for a reversal.* Several of the following cases are very similar to this case: 16 C.J. 817, § 2071; *People v. Bush,* 68 Cal. 623, 10 P. 169; *People v. Miller,* 33 Cal. 99; *Van Houtan [Van Houton] v. People,* 22 Colo. 53, 43 P. 137, *State v. Rubaka,* 82 Conn. 59, 72 A. 566; *State v. McGinnis,* 12 Idaho 336, 85 P. 1089; *Doyle v. Commonwealth,* 37 S.W. 153, 18 Ky. Law.Rep. 518; *State v. Ricks,* 32 La.Ann. 1098; *State v. Gonce,* 87 Mo. 627; *State v. Bell,* 70 Mo. 633; *State v. Grate,* 68 Mo. 22; *People v. Bragle,* 88 N.Y. 585, 42 Am.Rep. 269; *Commonwealth v. Simon,* 44 Pa.Super.Ct. 538.

*Warren v. State,* 537 P.2d 443, 445–46 (Okl. Cr.1975) (some citations omitted) (emphasis added) (quoting *McClendon v. State,* 36 Okl. Cr. 11, 251 P. 515 (1926)). Federal caselaw also supports this interpretation. Since a defendant's right to be present at trial stems from the Sixth Amendment right to confront

---

**3.** *Parker* is also dispositive of Appellant's complaint he was excluded solely because he threatened to be disruptive should he be required to remain in the courtroom during the second stage. The *Parker* defendant never entered the courtroom, as he clearly indicated to the trial court by his words and actions he would be disruptive during trial. *Id.,* 556 P.2d at 13–2–03, nn. 5 & 6. In light of Appellant's *in-camera* threat he would be disruptive, we see no error. We do not agree with Appellant that he later told the court he would not be disruptive. A thor-

ough reading of the record shows Appellant's later comment came in response to the judge's musings about how to inform the jury Appellant would not be present. The judge noted his concern Appellant's absence could be misconstrued by the jury as being an absence imposed by the court because of some disruption out of their presence. Taken in context, the comments dealt with the proper way to inform the jury Appellant would not be present during this stage of the trial.

the witnesses, *United States v. Gagnon*,[4] 470 U.S. 522, 526, 105 S.Ct. 1482, 1484, 84 L.Ed.2d 486 (1985); *Young v. Herring*, 938 F.2d 543, 557 (5th Cir.1991), *cert. denied*, ⸺ U.S. ⸺, 112 S.Ct. 1485, 117 L.Ed.2d 627 (1992), it follows that if a defendant can waive this right along with others when pleading guilty, he can waive this specific right during a trial.

 We therefore hold under the particular facts of this case Appellant had the ability to waive his right to be present during portions of the trial, providing he clearly and unequivocally expressed his desire to waive his presence during that portion of the trial.[5] We now turn to the record to determine whether Appellant here waived his right to be present.

The court first became aware of Appellant's wishes at the beginning of the second stage, when defense counsel told the judge "my client has advised me he is physically ill, that he does not desire to sit in this the rest of the proceeding," adding that the court probably should talk to him (Tr. 917). The court told Appellant defense counsel "has advised me that you wish to not be present during this proceeding?" to which Appellant answered, "No, I want to go back to my cell," adding in response to the court's query about additional time to consider, "It wasn't done right." At that point, the court asked if a recess would "let you calm back down [and] give you a chance to settle down a little bit?" Appellant acknowledged it might be helpful,

and the court recessed proceedings (Tr. 918). After recess, the following exchange took place:

THE COURT: Let's go on the record. Show that we're outside of the presence of the jury. We have taken a recess for about 25 minutes to let Mr. Box visit with Mr. Brown. And we have Mr. Brown here, we're outside of the presence of the jury with Mr. Singleterry, Mr. Brown and Mr. Box.

That I have been advised by Mr. Brown that he did not wish to remain in the courtroom throughout the proceedings and advised he would disrupt the trial if he has to. David if you will, tell me why you don't want to be in the courtroom?

MR. BROWN: I don't want to see my kids and family down there testifying because they are hurt already and I don't want to see them hurt no more.

THE COURT: You just ask that you be allowed to go upstairs?

MR. BROWN: Yes, sir.

THE COURT: Through the rest of the sentencing phase. Do you not want to be present?

MR. BROWN: I don't want to be up there.

THE COURT: When the verdict is read at all?

MR. SINGLETERRY: To which we object, You Honor, for the reason that we

**4.** *Gagnon* also states that a defendant's Due Process rights under the 14th Amendment may also be implicated in his right to be present during trial. 470 U.S. at 526, 105 S.Ct. at 1484; however, the presence of a defendant is a condition of Due Process only to the extent a fair and just hearing would be thwarted by his absence, and to that extent only. *Id.* Here, although Appellant was not present, his attorney was, and presented witnesses for Appellant as well as effectively cross-examining the sole additional witness presented during the sentencing portion of trial by the prosecution. We find no Due Process concerns implicated here, as we find the hearing was not thwarted by his absence.

**5.** We make this statement notwithstanding early statements by the Supreme court to the contrary. *See Frank v. Mangum*, 237 U.S. 309, 315, 35 S.Ct. 582, 584, 59 L.Ed. 969 (1915); *Diaz v. United States*, 223 U.S. 442, 455, 32 S.Ct. 250, 253, 56 L.Ed. 500 (1912); *Lewis v. United States*,

146 U.S. 370, 374, 13 S.Ct. 136, 137, 36 L.Ed. 1011 (1892); *Hopt v. Utah*, 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262 (1884). We initially note that in *Frank* and *Diaz* the language was dicta, as the cases did not deal specifically with a capital case. More important, we also note that all four cases were decided before the Sixth Amendment was applied to the states. *See Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). Therefore, the Court's review was limited to whether each appellant received Due Process of Law under the law of his particular state or territory, as required by the Fourteenth Amendment. This Court has interpreted this state's laws as allowing a defendant to waive his right to be present during part of his trial. *See Royal v. State*, 761 P.2d 497, 499 (Okl.Cr.1988). Appellant has therefore received the process that is due him under state law; therefore, the Supreme Court cases cited above are not implicated.

feel that the State of Oklahoma in the sentencing phase has a right to have a defendant there. We recessed initially because the defendant indicated to the Judge that he was sick. We find out now that he just doesn't want to appear which we feel the State of Oklahoma has a right to have him there since he does—he's not suffering from any physical malady.

THE COURT: I take it, Mr. Brown, if I would require you to remain in there, I would have problems?

MR. BROWN: Probably.

THE COURT: Okay. I'll grant your request. Mr. Box, your request also?

MR. BOX: Your Honor, I want to make a record. I have advised David and he's cooperated in his defense in this case all—he's been very cooperative. However, we have reached a point here at the very end that I advised David I think it's in his best interest to stay in the courtroom to help me represent him on this most crucial part of the case. I told him, I've explained to him that I cannot make him be present and I've explained to him that he puts me in an awkward position. I left the choice up to him. I just want to make it clear for the record, I'm advising him it's in the best interest to stay here. That contrary to my advise [sic] to him, he's exercised his right to not be present.

THE COURT: Okay. Do you understand, Mr. Brown, the fact that you're not here, the jury may infer something from that and that is your choice?

MR. BROWN: Yes, sir.

(Tr. 919–21). The court, prosecutor, and defense counsel then discussed the appropriate instruction that should be given the jury concerning Appellant's absence. During the discussion the court stated his concern was "I don't want [the jury] to think we've had some kind of disruption and why he's not here because we haven't had that at all." Appellant responded: "There is no disruption, I just don't want to see my kids get up there and testify." (Tr. 922).

We hold an adequate waiver took place. Appellant's counsel told the court he told Appellant he should stay in the courtroom, and Appellant desired to remain outside despite this admonition. We agree with the United States Court of Appeals for the First Circuit that the trial court need not recite an extensive litany of the consequences of an accused's actions before an accused can be allowed to waive his right to be present during trial. That court noted as an example in cases involving guilty pleas or right to remain silent, the Supreme Court required a defendant be told exactly what rights he forfeits in making his decision. However,

> In [those] cases we think that the consequences of the waiver were not so obvious or direct as those in a situation like the one before us. But, more important, those cases extended the constitutional umbrella so broadly because of other underlying problems. In *Miranda* the Court was concerned with the problems of direct coercion, the charged emotional atmosphere in many in-custody interrogations and the understandable fear held by an accused that he had better cooperate with the police if he hopes for any leniency later. In *Brady* the Court recognized that a multitude of extraneous factors, some of which might include improper prosecutorial activity, have frequently induced a decision to plead guilty. Thus, in both instances it was thought that the constitutional rights at stake could be meaningfully exercised only if the consequences of waiver were expressly told to the accused. These or similar underlying fears are simply absent in our case.

*United States v. Taylor,* 478 F.2d 689, 692 (1st Cir.1973), *affirmed,* 414 U.S. 17, 94 S.Ct. 194, 38 L.Ed.2d 174 (1973). Therefore, we find Appellant was sufficiently advised he had the right to remain in the courtroom during the proceeding, and clearly expressed his desire not to be present. We therefore hold the waiver was valid, and his absence voluntary.

The circumstances of this case show why the reason for allowing a waiver is likewise a time-honored one:

> In natural reason, one should not complain of a thing done with his consent. And the law in all its departments follows this principle. It is analogous to estoppel, or a

species of it. Like any other legal doctrine, the circumstances of a particular instance may compel it to give away to another. If, except where some counter doctrine presses with a superior force forbidding, a party has requested or consented to any step taken in the proceedings, or if at the time for him to object thereto he did not, he cannot afterward complain of it, however, contrary it was to his constitutional, statutory, or common-law rights. Necessity is the chief foundation for this doctrine, without it a cause could rarely be kept from miscarrying. .... Where a constitutional right in a criminal cause is largely for the benefit of the accused or in the nature of a personal privilege, the law is well settled that an accused may waive such right.

*Starr v. State,* 5 Okl.Cr. 440, 115 P. 356, 368 (1911). *See also United States v. Nunez,* 877 F.2d 1475, 1478 (10th Cir.1989), *cert. denied,* 493 U.S. 981, 110 S.Ct. 514, 107 L.Ed.2d 515 (1989) ("A court should, of course, vigilantly protect a defendant's constitutional rights, but it was never intended that any of these rights be used as a ploy to frustrate the orderly procedures of a court in the administration of justice." (quoting *United States v. Lawrence,* 605 F.2d 1321, 1325 (4th Cir.1979), *cert. denied,* 444 U.S. 1084, 100 S.Ct. 1041, 62 L.Ed.2d 770 (1980)).

 We believe the record clearly reflects the trial court made a thorough record and ascertained Appellant would be disruptive were he required to remain in the courtroom. Contrary to Appellant's assertions on appeal, the trial court had no constitutional duty to recess proceedings for the remainder of the day simply because Appellant did not want to be present. The decision whether to continue a proceeding rests with the discretion of the trial court, *Walker v. State,* 723 P.2d 273, 179–80 (Okl.Cr.1986), *cert. denied,* 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 600

(1986), and we see no abuse of that discretion here. Appellant did not request a continuance at the time, and we refuse to hold a trial court has the duty to wait until a defendant changes his mind and wants to be present during the proceedings. Likewise, we refuse to hold Appellant was incompetent to waive his right to be present simply because he did not follow his attorney's advice. The record indicates Appellant may have been upset at the way the first stage of his trial turned out, but there is nothing in the record to indicate he was incompetent, and he has presented us with nothing on appeal to show otherwise.

Therefore, Appellant's second proposition of error is without merit.

### B.

Appellant argues in his tenth proposition of error his conviction should be reversed because the prosecution incorporated all first-stage evidence into the punishment stage. He claims a violation of Okla. Const. art II, § 20, and 21 O.S.1981, § 701.10, in that insufficient notice was given to allow use of this evidence in the second stage.

 Appellant did not object to the inclusion of the first-stage evidence into the second stage of trial, and has thus waived it for consideration on appeal. *Williamson v. State,* 812 P.2d 384, 408 (Okl.Cr.1991), *cert. denied,* ── U.S. ──, 112 S.Ct. 1592, 118 L.Ed.2d 308 (1992). We note that Appellant was afforded an extensive preliminary hearing, at which virtually the same evidence[6] was brought out. Since the purpose of the requirement is to provide notice, and Appellant received that, there is no error warranting reversal. This proposition is without merit.

### C.

 Appellant next argues his sentence of death should be vacated because the sole

---

**6.** A comparison reveals only four people testified at trial who did not testify at the preliminary hearing. Otis Holeman transported the body to the medical examiner's office (Tr. 568); Junior Turner drew a scale diagram of the scene and testified as to the bullet's going through the corner of the television set; Dr. Chai Choi testified as to the cause of death; and Danny Purtel testified Appellant stayed at the El Reno motel

the first time. We find none of this evidence to be significant so far as notice is concerned. Appellant did not contest the cause of death, who transported the body or that he stayed in an El Reno motel. His attorney had seen the photographs of the scene, including one showing the path of the bullet through the television. Therefore, he cannot claim undue surprise at any of this previously unheard evidence.

aggravating circumstance used to sentence him was the existence of a probability he would commit criminal acts of violence that would constitute a continuing threat to society, 21 O.S.1981, § 701.12(7), and that aggravating circumstance is being interpreted in an unconstitutionally vague manner. As with a portion of his proposition dealing with prosecutorial misconduct and ineffective assistance of counsel, we will address only that portion of the complaint presented in his brief-in-chief, as Appellant has waived the portion presented in his supplemental brief by not including it in his brief-in-chief. *Castro,* 745 P.2d at 404; Rule 9.3(D), *Rules of the Court of Criminal Appeals,* 22 O.S.1991, Ch. 18, App.

Appellant acknowledges this Court has previously held this aggravator to be constitutional, *Boltz v. State,* 806 P.2d 1117, 1125 (Okl.Cr.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 143, 116 L.Ed.2d 109 (1991); *Munson v. State,* 758 P.2d 324, 334 (Okl.Cr.1988), *cert. denied,* 488 U.S. 1019, 109 S.Ct. 820, 102 L.Ed.2d 809 (1989), but urges us to reconsider. We refuse. This eleventh proposition of error is without merit.

### D.

■ Also without merit is his twelfth proposition, that the trial court improperly used an "anti-sympathy" instruction. He claims this improperly limited the jury's consideration of mitigating evidence and emotional responses to it.

Appellant acknowledges the trial court gave a second-stage instruction allowing the jury to use sympathy.[7] However, he now complains the jury would have been confused by this instruction, as they were instructed in the first stage not to allow sympathy, sentiment or prejudice to enter into their deliberations.

We heartily disagree. While it is true the court gave the jury an instruction providing for the incorporation of first-stage instructions into the second stage, the instruction specifies the guilt-stage instructions "apply where *appropriate* and must be considered

7. The instruction, given at the request of the State, read "[a]t this stage of the proceeding you

together with these additional instructions" (O.R. 205) (emphasis added). Appellant by arguing the jury was confused severely underestimates their intelligence and ability to determine where an instruction is appropriate and where it directly conflicts with an instruction in the first stage, thus making it inappropriate. We refuse to construe the capacity of a jury in that limited fashion. This proposition is without merit.

### E.

In his thirteenth proposition of error, Appellant contends the court erred in failing to give an instruction it had the option to give a life sentence even if it found the presence of the aggravating circumstance. We have addressed this issue previously. *See Williamson v. State,* 812 P.2d 384, 410 (Okl.Cr.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1592, 118 L.Ed.2d 308 (1992); *Walker v. State,* 723 P.2d 273, 284 (Okl.Cr.1986), *cert. denied,* 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 600 (1987). We see no reason to address it again.

### F.

■ Also previously addressed is Appellant's fourteenth proposition of error, that the court erred in failing to give a "presumption of life" instruction. *Battenfield v. State,* 816 P.2d 555, 564 (Okl.Cr.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1491, 117 L.Ed.2d 632 (1992); *Fox v. State,* 779 P.2d 562, 574 (Okl.Cr.1989), *cert. denied,* 494 U.S. 1060, 110 S.Ct. 1538, 108 L.Ed.2d 777 (1990). We are not persuaded by Appellant's citation of *People v. Tenneson,* 788 P.2d 786 (Colo. 1990), where the Colorado Supreme Court found no error in allowing such an instruction. To the contrary, the Colorado court opined that although there was no error in allowing the instructions, "we believe the better practice is to avoid the use of that term. . . . The use of this term has potential for confusing the jury by introducing an additional and unnecessary concept in an already

may consider sympathy and compassion for the Defendant in arriving at a decision" (O.R. 202).

complex set of instructions." *Id.* at 797.[8] We agree. This proposition has no merit.

### G.

Appellant argues in his fifteenth proposition of error the court erred in telling the jury mitigating circumstances are those which *may* be considered. He claims this creates doubt as to the jury's ability to consider evidence of mitigating circumstances. We rejected this argument in *Williamson*, 812 P.2d at 409. We do so again.

### H.

██ In his sixteenth proposition of error, Appellant claims the court erred in failing to list all the mitigating evidence presented at trial as reflected by the trial judge's post-trial report. We initially note the court instructed the jury they were to determine what mitigating circumstances were present (O.R. 200).

The jury was instructed as mitigation that Appellant was the father of two children; he has friends and family who love him; and he came from a broken home. The trial court in its post-trial report also noted evidence (1) Appellant had no significant past criminal history; (2) the murder occurred while he was under extreme emotional disturbance; (3) the deceased was a participant in his homicidal conduct; and (4) the murder occurred under circumstances which Appellant believed provided a moral justification or extenuation of his conduct.

We believe the last enumerated item from the trial judge does more harm than good, as it leads the jury to believe Appellant could find justification for killing anyone if the need suited him. The jury considered the third item from the trial judge's report—the deceased participated in the homicide by his own conduct—when it considered and rejected his self-defense theory. Therefore, this mitigator, even if presented to the jury,

would have been rejected again. Likewise, had he committed the homicide under extreme emotional disturbance, his heat-of-passion manslaughter theory would have been selected by the jury. They did not, and we find it highly unlikely the jury would have considered it again. In light of the kidnapping episodes, we do not believe the jury would believe the defendant had no significant past criminal history. In any case, the jury was free to consider his testimony and the evidence presented in his behalf, and determine that evidence was mitigated by their finding he posed a continuing threat to society. We find this proposition to be without merit.

### I.

██ In his seventeenth proposition of error, Appellant claims the trial court erred in not instructing the jury it had to find beyond a reasonable doubt the aggravating circumstances outweighed evidence presented in mitigation before it could impose the death sentence. We have previously rejected this argument in *Romano v. State*, 847 P.2d 368, 392 (Okl.Cr.1993); *Johnson v. State*, 731 P.2d 993, 1005 (Okl.Cr.1987), *cert. denied*, 484 U.S. 878, 108 S.Ct. 35, 98 L.Ed.2d 167 (1987), and do so again. We are not persuaded by Appellant's citation again of *People v. Tenneson*, 788 P.2d 786 (Colo.1990), where the Colorado court held such instructions were required. As we noted in the footnote above, that court's decision was based on its interpretation of its own constitution and statutes.

### J.

██ Appellant alleges in his eighteenth proposition of error the death penalty scheme in Oklahoma is unconstitutional, as the prosecutor has unbridled discretion in determining whether to seek it. We addressed the identical issue in *Romano*, 847 P.2d at 392–93, noting that "it is the obli-

---

8. The Colorado court also held the "presumption of life" instruction was unnecessary in light of its holding in the rest of the opinion, that instructions should be given telling the jury they must find aggravating circumstances outweigh mitigating ones beyond a reasonable doubt before they can assess the death penalty. We have declined to adopt that rationale. The Colorado court is basing its holding on its own constitution and state statutes, *Id.* at 792 n. 9, which this Court need not and does not adopt. Unlike the Colorado court, we cannot state with certainty our legislature intended such a result.

gation of a criminal defendant to demonstrate that the government's prosecution of him was based on impermissible discriminatory grounds." *Id.*, at 393 (quoting *United States v. Blitstein,* 626 F.2d 774, 782 (10th Cir.1980)). Appellant here has made nothing but vague, class-oriented allegations of discrimination based on economic status. We do not find these allegations sufficient to overcome the presumption prosecutors act in good faith in deciding which crimes to prosecute and which punishments to seek. *Blitstein; United States v. Bennett,* 539 F.2d 45 (10th Cir.1976), *cert. denied,* 429 U.S. 925, 97 S.Ct. 327, 50 L.Ed.2d 293 (1976).

## V. COMPETENT ASSISTANCE OF COUNSEL

Appellant urges in his twentieth proposition of error his conviction should be overturned because his counsel was incompetent. Specifically, he claims counsel was incompetent because he failed to more thoroughly investigate his claim of self-defense and failed to object to instances of prosecutorial misconduct.

We will address only for fundamental error, as we note this proposition is not properly before the Court. It was raised in a supplemental brief; therefore, as with portions of his fifth proposition dealing with prosecutorial misconduct and his eleventh proposition challenging the constitutionality of the continuing threat circumstance, this entire proposition is waived. *Castro,* 745 P.2d at 404; Rule 9.3(D), *Rules of the Court of Criminal Appeals,* 22 O.S.1991, Ch. 18, App.

We find no fundamental error. This Court has adopted the two-pronged test enunciated in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Williamson,* 812 P.2d at 384. Appellant must show his counsel's performance was deficient; and he must show the deficient performance prejudiced him. Unless an appellant can show both, "it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064; *Williamson,* 812 P.2d at 384.

■ Concerning the prosecutorial misconduct allegation, we need not address the first prong, as it is apparent Appellant cannot show prejudice. We have examined each of the instances of prosecutorial misconduct complained of as set forth in other portions of this opinion, and have already concluded no fundamental error occurred in any of them. That being the case, the outcome of the trial would not have been changed by the remarks and conduct of the prosecutor.

■ Concerning the self-defense-related claim, Appellant has introduced affidavits from Chickasha townspeople who knew either the decedent or Appellant. Had he been contacted, James Joseph Bunch would have testified that in 1986 or 1987, the decedent offered him $1,500 to kill David Brown. Had James Pool been contacted, he would have testified that at some unspecified time, the decedent told Appellant he would "blow his ass away" if he did not stay away from Lee Ann. Howard A. Hawthorn would have told the jury he heard the decedent claim he would get Appellant for what he had done. This occurred shortly before Appellant was shot. Medical records in a supplemental record show Appellant was treated at Grady Memorial Hospital on September 21, 1983, for a gunshot wound to the left flank. Donna Taylor and Linda Barker both overheard Lee Ann say that if Appellant had treated her decently, her father would not have to do what he had done. This was shortly after Appellant was shot in 1983. Appellant's mother recalled a conversation with Lee Ann, who speculated her father had Appellant shot; this conversation also occurred shortly after the 1983 shooting. This Court will not consider the affidavits, as they are not properly before the Court. *Castro,* 745 P.2d at 404.

■ In any event, for any of this evidence to be of value to Appellant, it would have to be admissible at trial. Statements concerning the 1983 shooting would be inadmissible hearsay, if they were introduced to prove the decedent had Appellant shot in 1983. Assuming a shooting occurring nearly five years before the decedent's death would have been admissible at all, it would have been only to show a pertinent trait of the

decedent's character, and that the decedent and Appellant did not get along. 12 O.S. 1981, § 2404(A)(2). Likewise the solicitation statement made to Mr. Bunch "[s]ometime in 1986, or 1987," would have been admissible only to show the friction still existed. Several people testified to this, and Appellant himself testified he was afraid of the decedent, yet drove to his house anyway.

Since the evidence would have been cumulative at best, we cannot say it would have changed the outcome of the trial. Therefore, Appellant cannot show prejudice.

■ Additionally, Appellant claims trial counsel could have uncovered all this evidence. We agree, as the information Appellant had been shot certainly would have been known by Appellant. Despite this, Appellant has not presented this Court with any evidence he apprised his attorney of this fact before or during trial. We agree with a federal court's assessment that "[t]rial counsel cannot be ineffective for failing to raise claims as to which his client has neglected to supply the essential underlying facts when those facts are within the client's possession; clairvoyance is not required of effective trial counsel." *Dooley v. Petsock*, 816 F.2d 885, 890–91 (3d Cir.1987).

■ And assuming counsel knew of the information, there is a valid reason for not presenting it to a jury. Appellant may be correct this information would show friction between the two men and fear by Appellant. But in any case, the fact Appellant had been shot at the decedent's behest on an earlier date could easily show Appellant harbored a grudge and shot the decedent out of revenge. This Court has held it will not second-guess trial strategy on appeal. *Williamson*, 812 P.2d at 412. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 413. Counsel knew friction existed between his client and the decedent. Assuming for purposes of discussion Appellant told counsel of the prior shooting, we do not believe counsel was inef-

fective for failing to further investigate. The earlier shooting, combined with existing friction, could make the motive for killing the decedent even stronger.

There is no fundamental error in this proposition, which is otherwise waived.

## VI. MANDATORY SENTENCE REVIEW

■ This Court is required by 21 O.S. 1991, § 701.13(C) to determine whether (1) the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of aggravating circumstances as enumerated in 21 O.S. 1981, § 701.12. Pursuant to this mandate and in response to Appellant's third proposition of error, we shall first determine whether the evidence was sufficient to support the aggravating circumstance alleged at trial.

The jury found the probability existed he would commit criminal acts of violence that would constitute a continuing threat to society. 21 O.S.1981, § 701.12(7). The continuing threat allegation was the sole aggravating circumstance at trial.

When taken in the light most favorable to the prosecution, the evidence shows not only that Appellant harbored ill will toward the decedent here, but also he bore a continuing grudge against his ex-wife. Appellant before the murder told the decedent "you all's time is up," adding they would pay for what they had done to him. He also told his ex-wife they would all be sorry for their actions. This anger toward more than one person was also evidenced in his statement to a friend that he did not care if the whole family were dead.

In addition, there is the incident at the beauty shop. At one point after the marriage with Lee Ann was terminated, Appellant walked into the hair styling shop where she worked. He was carrying a rifle. He said if anyone touched the telephone, he would shoot them. Although he did not shoot anyone, he pointed the gun at one barber in the shop, and at one point fired the weapon into a vacant barber chair. There

were several people in the shop at the time who could not escape because Appellant's location prevented them from doing so.

Appellant contends these incidents all related to a domestic dispute which no longer exists. While it is true a domestic dispute was behind most of his actions, we fear Appellant misses the point. He was not charged with the individual actions or statements. The prosecution alleged he would commit criminal acts of violence that would constitute a continuing threat to society. That being the case, "[u]nlike the determination of guilt or innocence which turns largely on an evaluation of the objective facts, the question whether death is the appropriate sentence requires a profoundly moral evaluation of the defendant's character and crime." *Satterwhite v. Texas*, 486 U.S. 249, 261, 108 S.Ct. 1792, 1800, 100 L.Ed.2d 284 (1988) (Marshall, J., concurring in part and concurring in the judgment). *See also Enmund v. Florida*, 458 U.S. 782, 801, 102 S.Ct. 3368, 3378, 73 L.Ed.2d 1140 (1982) (accused's punishment "must be tailored to his personal responsibility and moral guilt"); *Sellers v. State*, 809 P.2d 676, 691 (Okl.Cr.1991), *cert. denied*, — U.S. —, 112 S.Ct. 310, 116 L.Ed.2d 252 (1991) (jury balancing reasons a defendant deserves to live against reasons he should die, not one involving concrete determinations of facts that establish guilt). Here, the evidence established Appellant's attitude, which played a large part in allowing the jury to conduct a moral evaluation of his character. It was not simply that Appellant committed the actions he did or said the things he did; it was his attitude in blaming everyone else for his misfortunes. He created the disturbance at the beauty shop because his ex-wife would not agree to a reconciliation. He blamed his father-in-law and Lee Ann for ruining his life, when in fact it was Appellant, not anyone else, who created his problems by fleeing the state. He testi-

fied he ran because he did not think he could get a fair deal on the kidnapping charges, which he described as being "bullshit charges is all it was." (Tr. 827). We believe this attitude poses not only a danger to Lee Ann and to a lesser extent the decedent's wife, but also to anyone else in society whom Appellant would view as being responsible for any future major problem in his life.[9]

We believe this evidence is sufficient to show the existence of a probability Appellant would commit criminal acts of violence that would constitute a threat to society. This proposition is without merit.

■ For his fourth proposition of error, Appellant contends the evidence in mitigation outweighed the aggravating circumstance. The jury was instructed as mitigation that Appellant was the father of two children; he has friends and family who love him; he came from a broken home. The trial court in its report also noted evidence Appellant had no significant past criminal history; the murder occurred while he was under extreme emotional disturbance; the deceased was a participant in his homicidal conduct; and the murder occurred under circumstances which Appellant believed provided a moral justification or extenuation of his conduct. We believe the aggravating circumstance found by the jury outweighs these mitigating factors, which we determine are minimal at best.

Reviewing the evidence in mitigation and aggravation, we find the sentence of death to be factually substantiated and appropriate.

Finding no error warranting reversal or modification, the judgment and sentence for Murder in the First Degree is AFFIRMED.

JOHNSON, V.P.J., LANE, J., and STRUBHAR, JJ., concur.

CHAPEL, J., concur in part/dissent in part.

9. Lee Ann and her mother are both members of society; therefore, "society" is substantiated as to at least two people within that class. We need not quantify the number of people in "society" to hold that Appellant would threaten certain rights and privileges given by law to at least two of the decedent's relatives as members of society. Likewise, we are not able to ascertain how many others in society Appellant could threaten should they become an irritant to him. It is the attitude and actions of Appellant himself, not the number of people threatened, which determines whether he might commit future acts of violence and be a threat to society. Here, it is sufficient the facts support the aggravating circumstance in Appellant's case; and we continue to hold the term "society" does not need further definition.

CHAPEL, Judge, concurring in part and dissenting in part:

I concur in affirming the conviction in this case. However, I respectfully dissent from the majority's position holding it was not error for the trial court to allow Brown's absence from his sentencing trial. Although I agree with the general proposition that defendants may waive many of their constitutional rights, the issue in this case is whether the trial judge should have allowed this defendant to do so. Under the circumstances here, I do not think Brown should have been allowed to absent himself from the second stage proceedings.

Title 22 O.S.1981, § 583 provides:

If the indictment or information is for a felony, the defendant **must** be personally present at the trial, but if for a misdemeanor not punishable by imprisonment, the trial **may** be had in the absence of the defendant[.] (emphasis added).

The statute's language clearly states that a defendant's presence at trial is mandatory. Title 22 O.S.1981, § 912 further provides that the defendant must appear in person before the verdict is received.

Nevertheless, this Court has allowed trials to continue in the absence of the defendant when the defendant either disrupted the proceedings [1] or was voluntarily absent during the proceedings. See, *Royal v. State*, 761 P.2d 497 (Okl.Cr.1988) (defendant who failed to return after three-day weekend waived right to be present and could not rely on statute's mandatory language, as statute was reenacted after court's decisions allowing exceptions to the mandatory presence rule, indicating intent of legislature to adopt the exceptions); *Clark v. State*, 718 P.2d 375, 377 (Okl.Cr.1986) (not error to conduct portions of trial in absence of defendant who was permitted to leave because she believed people would laugh at her); *Love v. State*, 675 P.2d 466 (Okl.Cr.1984) (not error for court to continue proceedings in defendant's absence where defendant failed to reappear after noon recess of first day of trial); *Sonnier v. State*, 597 P.2d 771, 773 (Okl.Cr.1979) (not error to deny motion for continuance and continue with proceedings where defendant failed to appear); *Delancy v. State*, 596 P.2d 897 (Okl.Cr.1979) (not error to proceed without defendant's presence from 11:00 a.m. until noon recess where defendant failed to appear because he was with his wife who was hospitalized in maternity ward); *Clonce v. State*, 588 P.2d 584, 589 (Okl.Cr.1979) (not error to conduct second stage without defendant's presence where defendant failed to appear following the first stage of trial); *Ware v. State*, 556 P.2d 1073, 1075 (Okl.Cr. 1976) (not error to conduct second stage in absence of defendants who did not return for the proceedings and where there was no reason given for their absence); *Warren v. State*, 537 P.2d 443 (Okl.Cr.1975) (not error to continue trial in absence of defendant who did not appear after first day of trial); *Roberts v. State*, 523 P.2d 1150 (Okl.Cr.1974) (not error to conduct proceedings in defendant's absence where defendant failed to return after a noon recess, and did not return for three days).

I would limit the "voluntary absent" exception to situations where the defendant actually disappeared or escaped custody and was no longer physically present. [2] My concern here is that Brown was present and could have been brought into the courtroom, even forcefully if necessary. Only if Brown seriously threatened to create a disturbance or actually did create a disturbance should he then have been removed from the courtroom. Moreover, Brown's reasons for wanting to be absent from his sentencing trial were weak. Brown simply did not want to attend his sentencing hearing because he did not feel the first stage proceedings were "done right" and because he did not want to hear his

1. This exception is not applicable to Brown's case. Although the majority disagrees, my reading of the transcript indicates Brown finally stated he would not disrupt the proceedings if compelled to attend.

2. This is the situation in the majority of the "voluntarily absent" cases cited above. *Clark,* supra, is the only case to date which upheld the trial court's allowance of a defendant to be absent simply because she did not want to be present, as opposed to because she had absconded and could not be located. *Clark* takes the "voluntarily absent" exception too far and should be overruled.

children testify. Brown was understandably distressed after hearing the jury's first stage verdict, but this was not sufficient reason to allow him to waive a right as important as attending his own trial. The state also has an interest in having the defendant present at trial and in this case the state objected to Brown's removal. Furthermore, a defendant's presence at trial is required not only by statute and not only for the defendant's protection, but to maintain the integrity of the system as a whole. When citizens are tried for crimes in their absence, the public's faith in our system of justice is undermined.

Although I agree that in some cases it is necessary to continue with the proceedings in the absence of the defendant, the "voluntary absence" exception as applied by this court is far too lax. "One step further could simplify the trial even more, i.e., submit the accused person to trial prior to his apprehension in true 'absentia' form." *Warren v. State, supra,* 537 P.2d at 448, (Brett, P.J. dissenting). I would limit this exception to cases where the defendant has escaped or absconded and is no longer present in person.[3] Because Brown was available and could have been brought into the courtroom, the trial court erred in allowing his absence. Therefore, I would reverse the sentence and remand this case for resentencing.

**3.** In situations where physical illness precludes the defendant from attending his or her trial, the court should grant a continuance.