Gregg Francis BRAUN, Petitioner,

v.

The STATE of Oklahoma, Respondent.

No. C–93–993.

Court of Criminal Appeals of Oklahoma.

Aug. 7, 1995.

Rehearing Denied Sept. 12, 1995.

James T. Rowan, Oklahoma Indigent Defense System Capital Litigation Div., Norman, Phil S. Hurst, Sulphur, Trial Counsel for petitioner.

Fred Collins, District Attorney, Jack Barton, Assistant District Attorney, Ardmore, Trial Counsel for respondent.

Carol A. Walker, Lee Ann Jones Peters, Assistant Appellate Public Defenders, Norman, Appellate Counsel for petitioner.

Susan Brimer Loving, Attorney General of Oklahoma, A. Diane Blalock, Assistant Attorney General, Oklahoma City, Appellate Counsel for respondent.

## OPINION

LUMPKIN, Judge.

Petitioner Gregg Francis Braun pled nolo contendere to Count I, Murder in the First Degree (21 O.S.Supp.1989, § 701.7(A or B)); Count II, Shooting with Intent to Kill (21 O.S.Supp.1987, § 652); Count III, Shooting with Intent to Kill (21 O.S.Supp.1987, § 652); Count IV, Robbery with Firearms (21 O.S.Supp.1982, § 801); and Count V, Robbery with Firearms (21 O.S.Supp.1982, § 801) in Carter County Case No. CRF–89–332. The Honorable Thomas S. Walker, District Judge, sentenced Petitioner to twenty-five (25) years on each robbery count and life on each count of Shooting with Intent to Kill. After finding the presence of three aggravating circumstances, the trial court sentenced Petitioner to death for the murder. The trial court ordered each sentence to be served consecutively. Petitioner subsequently filed a motion to withdraw his guilty plea, which the trial court denied. We affirm that denial.[1]

## I.

The charges arose from the July 21, 1989, robbery of Dodson Floral shop in Ardmore. After taking money from the shop's cash register and money from customer Mary Manning's purse, Appellant calmly herded Ms. Manning and shop employees Jo Ann Beane and Gwendolyn Miller into a room in the back of the shop, ordered them to lie on the floor, then shot each woman in the head with a .25 caliber pistol. Although temporarily blinded and made deaf by the shot, Ms. Beane managed to crawl to the telephone, pull it off the counter, and notify authorities by shouting into the telephone after giving them what she thought would be time to answer the call. Ms. Beane and Ms. Manning survived; Ms. Miller did not.

In addition to an eventual eyewitness identification from a photographic lineup, authorities found shell casings in the flower shop; a firearms expert later determined the casings were fired from the same pistol Petitioner had when he was apprehended in New Mexico. Braun's fingerprint was also found on a receipt from Ms. Manning's purse. When Appellant was apprehended in New Mexico, he told authorities of the Ardmore homicide, as well as homicides in Kansas and Texas. When he was asked how he could shoot someone in the back of the head like he did, he chuckled and said "It wasn't as good as shooting craps in Vegas, but it was all right."

Other evidence produced at Petitioner's sentencing hearing showed the Ardmore murder was one in a series of murders across four states. Petitioner started in Garden City, Kansas, where he killed two convenience store clerks after robberies. He then drove to Pampa, Texas, where he killed a man in a photograph development store. The murder in Ardmore followed. The last one was in New Mexico, where he again killed a convenience store clerk. As of the date of his Oklahoma plea, he had received a life sentence (in addition to thirteen (13) years for another crime) in New Mexico; and four consecutive life sentences (in addition to two 15–year terms) in Kansas. Those victims were also shot by a .25 caliber pistol, and casings recovered from the scenes were fired from the pistol Petitioner had in his possession when he was arrested. There

---

1. In so doing, we note the following: the Petition for Writ of Certiorari in this case was filed February 23, 1994; it was fully briefed and at issue (Respondent's brief-in-chief and Petitioner's Reply Brief filed) October 31, 1994; oral argument was held March 28, 1995, and the cause ordered submitted to this Court following that argument.

was no evidence indicating the disposition of any crimes in Texas.

Based on the evidence presented during the sentencing hearing, the court found the existence of three aggravating circumstances: that Petitioner knowingly created great risk of death to more than one person (21 O.S. 1981, § 701.12(2)); the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution (21 O.S.1981, § 701.12(5)); and the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society (21 O.S.1981, § 701.12(7)). The court did not find a fourth aggravating circumstance alleged: that Petitioner was previously convicted of felony involving use of threat or violence to person (21 O.S.1981, § 701.12(1)).

## II.

For his first proposition, Petitioner contends he was denied the assistance of counsel in the hearing on his motion to withdraw his nolo contendere plea to the charge of murder.[2] To fully understand this proposition, some background is necessary.

James T. Rowan of the capital defense litigation team was appointed to represent Petitioner. Petitioner also had local counsel, Phil Hurst. Counsel filed several motions. Pursuant to a local court rule, the trial court ordered counsel to submit a brief in support of each motion, in addition to the motion itself. Although counsel filed a memorandum brief in support of a motion for change of venue, the record does not reflect an actual motion for change of venue was filed; nor does it indicate affidavits by county residents were filed, as required by 22 O.S.1991, § 561. The trial court ordered stricken the motions not supported by brief; apparently (though never specifically stated), the brief not supported by motion for change of venue was stricken at the same time.

After the plea, Mr. Rowan signed and filed on Petitioner's behalf a "Motion to Withdraw Nolo Contendere Plea and Have Attorney Appointed to Represent Him." The motion alleged the plea was involuntary. New counsel was requested "in order to allow the Defendant full latitude in exploring any grounds he may have to in support of his motion to withdraw his Nolo Contendere plea."

At the September 21 hearing, Mr. Rowan was present, but not as Petitioner's counsel. According to the court, the Indigent Defense System had made arrangements for another attorney to represent Petitioner at the hearing; however, that attorney was not present, and the record is otherwise silent. Petitioner then elected to proceed *pro se*. He now claims the record was insufficient to show his decision to proceed *pro se* was voluntarily or knowingly made. We disagree.

A waiver of counsel is valid only if it is done knowingly and voluntarily. *See Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). A record of the knowing and voluntary waiver is mandatory, and absent a sufficient record, waiver will not be found. *Lineberry v. State*, 668 P.2d 1144, 1145–46 (Okl.Cr.1983). We have held repeatedly that the record must show the trial court advised the defendant of the dangers and disadvantages of self-representation to establish a record sufficient to support valid waiver of counsel. *See Stevenson v. State*, 702 P.2d 371, 374–75 (Okl.Cr.1985); *Dunnum v. State*, 646 P.2d 613, 614 (Okl.Cr.1982); *Johnson v. State*, 556 P.2d 1285, 1292–93 (Okl.Cr.1976). The trial court must explain to the defendant the disadvantages of a waiver, including a lack of knowledge and skill as to rules of evidence, procedure and criminal law. Anything less than a record which shows that the defendant rejected the offer of counsel with knowledge and understanding of the perils of self-representation is not waiver. *Swanegan v. State*, 743 P.2d 131, 132 (Okl.Cr.1987).

---

**2.** Petitioner did not seek to withdraw his pleas of nolo contendere to anything other than the murder charge, for which he received the death penalty. Although he had announced at the beginning of the plea hearing he would plead guilty to felony murder, he pled guilty to both the charge of murder and Robbery with a Dangerous Weapon, the charge which had been the basis for the felony murder charge.

In *Swanegan,* we said that before an accused may represent himself or herself, the trial court is required to determine whether the accused has the capacity to make a valid waiver of right to counsel. The court must then examine the defendant and determine whether the waiver is voluntary, knowing and intelligent. In doing this, the trial judge must clearly explain to the defendant the inherent disadvantages in such a waiver. *Id.; see also Coleman v. State,* 617 P.2d 243, 245–46 (Okl.Cr.1980).

Whether there has been a valid waiver of right to counsel is to be determined from the total circumstances of the individual case including background, experience and conduct of the accused. *United States v. Warledo,* 557 F.2d 721 (10th Cir.1977). Further, where a defendant elects self-representation, he may not later be heard to complain that he was denied effective assistance of counsel. *Green v. State,* 759 P.2d 219, 221 (Okl.Cr.1988), citing *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), and *Johnson,* 556 P.2d at 1297.

An examination of the record before this Court shows the trial court began with the observation Petitioner had the right to represent himself, adding a caveat the court must be satisfied Petitioner understood what he was doing and was not coerced, pressured or threatened into doing so. He then asked Petitioner if he wanted to represent himself. Petitioner responded:

Well, at this hearing because the lawyer that was appointed to represent me—I haven't heard from him. I haven't met him. He didn't show up today, and I don't want to be brought back here again and go through all this again, so I'm ready to represent myself at this hearing today.

(WD Tr. 4). Petitioner then reaffirmed he knew another attorney had been appointed for him, but that attorney had not contacted him.

So today when I showed up, I assumed he would be here; and he's not. So I'm—I don't even want to deal with the guy, and

I'm prepared to represent myself at this hearing.

(WD Tr. 5). The court then said:

If you want, I will entertain your request to reset the hearing whenever this lawyer, whether it's Mr. Payne or somebody else, can be here. If you want to represent yourself as I told you earlier, I cannot deny you that as long as I am convinced that you know what you're doing, and some prosecution person didn't give—force you to do it.

(WD Tr. 5); to which Petitioner responded:

Yes. I'll represent myself, and I've already discussed—I know what's going on with this hearing and what it's about, and I'm prepared to represent myself.

(WD Tr. 5–6). He added he was under no pressure, and no promises had been made. In response to yet another question from the court, Petitioner said he wanted to represent himself at that time. The court then repeated his offer of a delay, saying he would "put this hearing off in a second attempt, if you will, to have an attorney here to represent you." Petitioner said he understood that, adding he would prefer to proceed *pro se* (WD Tr. 6). The court again pressed the question, stating:

So if there is any question in your mind or there is something else about these circumstances that I need to know about, this is the time to tell me. I mean, this isn't—I hesitate to use the word, "game," given the circumstances. But this isn't a situation of just going through the motions. Even though it's not my life that's on the line, I'm taking this just as seriously as you are. And so if there's something else I need to know, Mr. Braun, today at this hearing is the time to tell me about it. Is there some other circumstance that I don't know about that's causing you to tell me you're going to represent yourself?

THE DEFENDANT: Well, in a way; but then again, uh, I'm really tired of being moved around, you know, here in this jail, being stuck in a holding cell and things like this for a day or two; and to come in here, and some lawyer who I don't even know isn't here. And then they say, "Well, we'll put it off again." And, you know, they'll

take me back to prison, and they'll drag me up here in a few more days, and blah, blah, blah. And I just want to do it now, and I understand what's going on. I know what this is about, and I've discussed it with Jim prior to today; and I am prepared to do it today regardless of the outcome or the consequences because basically, I know I'm here to tell my side of the story of why I plead nolo contendere, and I don't need a lawyer to do that.

(WD Tr. 7–8). After being warned he could be cross-examined if he took the stand, Petitioner replied:

> I—I wouldn't need one to consult on cross-examination because basically, I know—I know what I'm gonna testify to, and it's all fact, and it's all true. So I'm not worried about being cross-examined.
>
> THE COURT: Well, but there's a little bit more to it than that. Just as I can't read your mind, I can't read [the prosecutor's] mind. He may call witnesses too, which will mean you would be in the position of having to cross-examine [the prosecutor's] witnesses; and again, you would be doing that without a lawyer. Do you understand that?
>
> THE DEFENDANT: Yes, sir, I do.
>
> THE COURT: And you're prepared to do that?
>
> THE DEFENDANT: Yes, sir.

Based on this exchange, the court found the waiver was knowing and voluntary (WD Tr. 9).

This record shows Petitioner was offered counsel but intelligently and understandingly rejected the offer, that he knew what he was doing and his choice was made "with eyes open." *Adams v. United States ex rel. McCann,* 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268 (1942). The waiver of counsel was both knowing and voluntary.

It is clear Petitioner was impatient as well as dissatisfied with his jail cell. However, that does not mean he did not knowingly and intelligently waive his right to counsel at the hearing. As we said in *Johnson,*

> The test whether a defendant has intelligently elected to proceed *pro se* is not the wisdom of the decision or its effect upon the expeditious administration of justice. It is only necessary that a defendant be made aware of the problems of self-representation so the record establishes that he understands that his actions in proceeding without counsel may be to his ultimate detriment.

*Johnson,* 556 P.2d at 1294. Or, put another way:

> [T]his court recognize[s] that the defendant cannot use his right to counsel "to play a 'cat and mouse' game with the court, or by ruse or stratagem fraudulently seek to have the trial judge placed in a position where, in moving along the business of the court, the judge appears to be arbitrarily depriving the defendant of counsel."

*United States v. Willie,* 941 F.2d 1384, 1390 (10th Cir.1991), *cert. denied,* 502 U.S. 1106, 112 S.Ct. 1200, 117 L.Ed.2d 440 (1992) (quoting *United States v. Allen,* 895 F.2d 1577, 1578 (10th Cir.1990)).

Accordingly, this proposition is without merit under the total circumstances of this case.[3]

## III.

For his second proposition, Petitioner claims his trial counsel was ineffective. He claims that but for counsel's improper handling of the motion for change of venue, he would not have pled nolo contendere and would have insisted on going to trial. In addition to his own testimony, Petitioner called Mr. Rowan, who said he should have properly filed the motion for change of venue, but did not, and had no strategic reason for not doing so.

### A.

[redacted] Petitioner correctly cites *Hill v. Lockhart,* 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985) as the proper law for ineffective assistance of counsel in guilty plea cases.

3. In light of this holding, we need not address the assertion by Respondent that Petitioner actually had assistance of counsel in the form of Mr. Rowan, with whom Petitioner obviously consulted both before and during the hearing. This is discussed in more detail below.

Under that standard, in order to obtain relief for ineffective counsel after a guilty plea, a petitioner must show first "counsel's representation fell below an objective standard of reasonableness." *Id.,* 474 U.S. at 57, 106 S.Ct. at 369 (citing *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 2064–65, 80 L.Ed.2d 674 (1984)). Second, a petitioner must show prejudice, which in the context of a guilty plea "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Id.* 474 U.S. at 59, 106 S.Ct. at 370. Or, as the Court rephrased the requirement, a petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* See also *Medlock v. State,* 887 P.2d 1333, 1345 (Okl.Cr.1994); *Estell v. State,* 766 P.2d 1380, 1382 (Okl.Cr.1988).

For reasons stated below, we need not address whether counsel's representation fell below an objective standard of reasonableness, as we find nothing in the record showing that but for any alleged substandard representation, Petitioner would not have pled nolo contendere and would have insisted on going to trial.

**B.**

■ Initially, although he had ample opportunity to do so, Petitioner at no time during his nolo plea complained of his counsel's performance. To the contrary, when asked, Petitioner said he was satisfied with his counsel's representation. He qualified this statement during the hearing on the application to withdraw the plea by saying he felt representation was good and pleading was his best option of the options available to him at the time, after the court refused to consider his motion for change of venue. He also admitted he made no mention of his complaint against counsel at the sentencing hearing, saying he did not think there would be any point in doing so.

More telling is Petitioner's response to the prosecutor's question concerning the sentence received. During cross-examination, the following exchange occurred:

Q. Did I hear you just telling Judge Walker that had he imposed a life without parole sentence, you wouldn't be up there today, asking to withdraw?

A. No, sir. I'd be back in Santa Fe.

Q. So your basic burr is the sentence you got.

A. Well, yes and—

Q. Yes or no?

A. The basic? Yes, that is the basic.

(WD Tr. 19–20; *see also* statement by counsel at WD Tr. 50). Petitioner also admitted his plea was not involuntary.

Also entering into Petitioner's calculus was his wish to personally speak to the jury. Petitioner testified that, even after the change of venue was stricken, Petitioner asked his counsel to file a motion to allow him to argue before the jury during the penalty phase for ten or fifteen minutes. If that was successful, Petitioner testified he would "go with the jury." (WD Tr. 13). On the other hand, if the motion was denied, Petitioner said he would "go ahead with the plea" (WD Tr. 13, 48).

This evidence, combined with his failure to complain of counsel during two earlier hearings despite opportunities to do so, and his prior experiences with the judicial system, negates Petitioner's testimony that but for counsel's errors, he would have not pleaded nolo contendere and would have insisted on going to trial. *See Wilhite v. State,* 845 S.W.2d 592, 595 (Mo.Ct.App.1992). From this, it seems clear Petitioner pled nolo contendere not because he failed to get a change of venue, but because he would not be allowed to speak to the jury and he received the death penalty.

Petitioner admitted he elected to plead in front of the judge because he thought he had a better chance of receiving life without parole. Under the circumstances, this seems a sound strategic choice. *Medlock,* 887 P.2d at 1345; *Estell,* 766 P.2d at 1382.[4]

---

4. It is because of this we reject Petitioner's contention on appeal it was *per se* ineffective assistance of counsel to allow Petitioner to enter a blind plea to the charge. Petitioner claims this is at least partly true because in Oklahoma, district court judges are elected to their positions, and

## C.

Dissatisfaction with sentence aside, Petitioner has failed to show prejudice as it is defined in *Hill*. This Court has never discussed extensively the "prejudice" prong of incompetent counsel in guilty pleas. Here, such a discussion is beneficial to further show why reversal is not warranted.

■ A petitioner in most instances must do more than simply testify that but for counsel's errors, he would not have pled guilty or nolo contendere and would instead have insisted on going to trial. We do not think it would surprise courtroom observers to know most defendants who received a death sentence after a plea would seek to withdraw that plea. Accordingly, any court would tend to cast a suspicious eye toward testimony from a person whose credibility on the subject is at best suspect.

The Supreme Court, too, requires more than a simple assertion by a defendant.

In many guilty plea cases, the "prejudice" inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective assistance challenges to convictions obtained through a trial. For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial. Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the "prejudice" inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial. *See, e.g., Evans v. Meyer*, 742 F.2d 371, 375 (CA7 1984) ("It is inconceivable to us ... that [the defendant] would have gone to trial on a defense of intoxication, or that if he had done so he either would have been acquitted or, if convicted, would nevertheless have been given a shorter sentence than he actually received"). As we explained in *Strickland v. Washington, supra*, these predictions of the outcome at a possible trial, where necessary, should be made objectively, without regard for the "idiosyncrasies of the particular decisionmaker." *Id.*, 466 U.S., at 695, 104 S.Ct. at 2068.

*Hill*, 474 U.S. at 59–60, 106 S.Ct. at 370–71; *see also State v. Soto*, 121 Idaho 53, 822 P.2d 572, 574 (Idaho Ct.App.1991). Here, we must therefore examine the evidence to determine if the motion for change of venue would have succeeded; and if such a motion would have changed the outcome of a trial.[5]

---

are thus more subject to the pressures of the general population. We refuse to indulge in such fanciful speculation. Indeed, Petitioner himself testified during the hearing on his motion to withdraw his plea that when he worried the judge would be under "a lot of pressure ... to give me a death sentence," his attorneys said "No, that's not true ... Judge Walker has been a judge for twenty years. He—he doesn't even have anybody who runs against him during election. He's a veteran. He won't feel pressure." (WD Tr. 12–13). Thus, Petitioner's own words at the hearing belies his assertions on appeal.

5. We recognize Appellant admitted he understood he had waived his right to appeal pre-trial errors by entering his plea of nolo contendere. *See* Transcript of Motion to Withdraw Guilty Plea at 40, where Appellant said: "But I—I knew that—that once I entered the plea, I lost my right to appeal pretrial errors, I guess you'd say." This would appear to be an accurate statement of the law. *See Hammons v. State*, 560 P.2d 1024, 1029 (Okl.Cr.1977) (procedure followed by trial court, in taking motion for change of venue under advisement until after extensive voir dire, was "in accordance with that recommended by this Court on numerous occasions"); *Johnson v. State*, 556 P.2d 1285, 1289 (Okl.Cr.1976) ("Where there has been widespread adverse pretrial publicity about defendant, proper procedure in the vast majority of cases is ... to proceed to trial and to determine on voir dire of panel and individual talesmen whether fair and impartial jury can be selected.") (quoting *Shapard v. State*, 437 P.2d 565, 578 (Okl.Cr.1967); *United States v. Hoffa*, 156 F.Supp. 495 (D.C.1957)); *Rucker v. State*, 88 Okl.Cr. 15, 41, 195 P.2d 299, 313 (1948) ("The ease with which a jury was obtained and qualified on their voir dire to try the cause, before the application for change of venue was denied, was of some probative force to show that a change of venue was not necessary to insure the defendant a fair trial.") (quoting *State v. Taylor*, 138 Kan. 407, 26 P.2d 598

### 1.

We begin by addressing Petitioner's complaint his trial counsel did not file the three affidavits in support of a motion as required by 22 O.S.1991, § 561. We have "held as early as 1916, and consistently since, that the affidavits raise a question just as any other question of fact that might be submitted to the trial judge, and unless it is clear that he has abused his discretion, or committed error in his judgment, his finding and judgment will not be disturbed by this Court." *Walker v. State*, 723 P.2d 273, 278 (Okl.Cr.), *cert. denied*, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 600 (1986) (quoting *Johnson*, 556 P.2d at 1289). Therefore, although statutorily required, the act of filing the affidavits do not in and of themselves dispose of the issue.

### 2.

We then observe the rebuttable presumption an accused can receive a fair trial in the county in which the offense occurred and the burden of persuasion is on the accused, who must show actual exposure to the publicity and resulting prejudice by clear and convincing evidence. *Brown v. State*, 871 P.2d 56, 62 (Okl.Cr.), *cert. denied*, —— U.S. ——, 115 S.Ct. 517, 130 L.Ed.2d 423 (1994); *Shultz v. State*, 811 P.2d 1322, 1329–30 (Okl.Cr.1991). Merely showing that pre-trial publicity was adverse to him is not enough. *Id.; Bear v. State*, 762 P.2d 950, 953 (Okl.Cr.1988); *Foster v. State*, 714 P.2d 1031, 1037 (Okl.Cr.), *cert. denied*, 479 U.S. 873, 107 S.Ct. 249, 93 L.Ed.2d 173 (1986). Consistent with this standard of review, "[e]ven if sufficient reasons exist so that the trial court would have been justified in granting a motion to change venue, we will not reverse the lower court's decision unless

(1933)); *Id.*, 195 P.2d at 313–14 ("It is not an abuse of discretion to deny a change of venue where the subsequent proceedings show that there was no difficulty in securing a fair and impartial trial.") (quoting *Sweet v. State*, 70 Okl. Cr. 443, 107 P.2d 817, 821 (1940)). *See also Tibbs v. State*, 819 P.2d 1372, 1377 (Okl.Cr.1991) (noting with approval trial court had reserved its ruling on motion for change of venue until after the voir dire examination had been completed, at which time the motion was denied); *Bear v. State*, 762 P.2d 950, 954 (Okl.Cr.1988) (noting

the circumstances surrounding the trial compel it." *United States v. Williams*, 897 F.2d 1034, 1037 (10th Cir.1990), *cert. denied*, 500 U.S. 937, 111 S.Ct. 2064, 114 L.Ed.2d 469 (1991). In cases going to trial in which a change of venue had been denied, the relevant inquiry on appeal is whether the accused received a fair trial from jurors who could lay aside any personal opinions and base a verdict on the evidence. The burden of persuasion still lies with the accused to present evidence showing by clear and convincing evidence "that the minds of the inhabitants of the county in which the cause is pending are so prejudiced against the defendant that a fair and impartial trial cannot be had therein." *Brown*, 871 P.2d at 62 (quoting *Wininegar v. State*, 97 Okl.Cr. 64, 68, 257 P.2d 526, 531 (1953)).

In those instances, we have applied a two-pronged test to determine whether juror knowledge and pre-trial publicity violated due process. *Shultz, supra*. We have adopted the two-part test set forth by the United States Supreme Court to aid an appellate court in reviewing allegations of due process violations arising from prior knowledge by jurors and pre-trial publicity. *See Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975).

First, there are cases in which prejudice will be presumed, if the fact pattern reveals "the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings." *Id.* at 799, 95 S.Ct. at 2035. The key to this standard appears to be the "solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of the mob." *Id.* If the facts are not sufficiently egregious to give rise to the presumption, the "totality of cir-

question whether jurors have opinions that disqualify them is a question of fact, the resolution of which is entitled to special deference by a reviewing court, adding "[t]his is especially true where, as here, that determination is made after an extended voir dire designed specifically to identify biased veniremen and the trial court's determination that jurors are unbiased is essentially one of credibility."). However, based on our analysis below, we are not required to determine in this case if waiver for one purpose constitutes waiver for all purposes.

cumstances" will be examined to determine whether the defendant received a trial which was "fundamentally fair." *Id.* At a trial, a review of the case should focus on the voir dire statements of the individual jurors, voir dire statistics, and the community atmosphere as reflected in the news media. *Id.* at 800–08, 95 S.Ct. at 2036–40.

In the present case, we find nothing in the record to indicate the influence of the news media pervaded the proceedings, nothing to show a "barrage of inflammatory publicity or that the jurors were predisposed to convict." *Shultz,* 811 P.2d at 1330. We recognize we have previously denied Petitioner's attempts to supplement the record with Exhibits A through FFF, consisting of newspaper articles from the *Daily Ardmoreite* and *The Daily Oklahoman* which relate to Petitioner's case. *See* Order Denying Motion to Supplement filed July 28, 1994, and Order Denying Motion to Reconsider filed August 31, 1994. We find now, as we did then, the mere fact pretrial publicity was adverse to him is not enough. *See Gregg v. State,* 844 P.2d 867, 871 (Okl.Cr.1992). Petitioner did not assert that although the details in the articles may not have been flattering, they were not factual and were invidious or inflammatory in nature. *See Rojem v. State,* 753 P.2d 359, 365 (Okl.Cr.), *cert. denied,* 488 U.S. 900, 109 S.Ct. 249, 102 L.Ed.2d 238 (1988) (citing *Beck v. Washington,* 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962)). As we said in *Rojem:*

> Mere exposure to publicity surrounding a criminal case simply does not demonstrate prejudice. Media coverage extends to most homicides, particularly capital cases. As stated many times by this Court, a defendant is not entitled to jurors ignorant of his case. *Wooldridge v. State,* 659 P.2d 943 (Okl.Cr.1983). "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented." *Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751, 756 (1961).

*Id.* We also find it somewhat dispositive that the publicity occurred over a four-year period. *See Hayes v. State,* 738 P.2d 533, 538 (Okl.Cr.1987), *vacated on other grounds,* 486 U.S. 1050, 108 S.Ct. 2815, 100 L.Ed.2d 916 (1988) (of 27 news articles presented, all were published one and one-half years before trial). Accordingly, we see nothing to indicate the news media pervaded the proceedings.

In the absence of allegations of such egregious publicity, we refuse to apply the presumption that a due process violation occurred in this case. *Bear,* 762 P.2d at 953; *Harvell v. State,* 742 P.2d 1138, 1141 (Okl.Cr. 1987).

██ If the facts are not sufficiently egregious to give rise to a presumption of prejudice, the totality of the circumstances will be examined to determine whether the accused received a trial which was fundamentally fair. *Murphy,* 421 U.S. at 799, 95 S.Ct. at 2035–36. Again, we observe "[q]ualified jurors need not ... be totally ignorant of the facts and issues involved." *Id.* at 799–800, 95 S.Ct. at 2036. As this Court has observed:

> It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Rowbotham v. State,* 542 P.2d 610, 615–16 (Okl.Cr.1975), *modified on other grounds,* 428 U.S. 907, 96 S.Ct. 3218, 49 L.Ed.2d 1215 (1976) (quoting *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)).

In the past, we have rejected claims that extensive publicity necessitated reversal. *See e.g., Dutton v. State,* 674 P.2d 1134, 1137 (Okl.Cr.1984) (Despite fact a co-defendant was granted a change of venue, Appellant failed to overcome the presumption that he

was able to receive a fair trial); *Stafford v. State,* 669 P.2d 285, 290 n. 1 (Okl.Cr.1983), *vacated on other grounds,* 467 U.S. 1212, 104 S.Ct. 2652, 81 L.Ed.2d 359 (1984), *cert. denied,* 473 U.S. 911, 105 S.Ct. 3537, 87 L.Ed.2d 660 (1985) (Mere fact there was much publicity concerning the McClain County crime, the Oklahoma County "Sirloin Stockade murders" and the Appellant's implication in both did not by itself establish Appellant could not receive a fair trial in McClain County); *Driskell v. State,* 659 P.2d 343, 357–58 (Okl.Cr.1983) (Despite evidence presented in the form of affidavits, the testimony of a radio owner and manager who broadcast six months prior to the trial for two days an editorial concerning the appellant and the judicial system, newspaper clippings, and the testimony of a banker concerning a fund being raised for the victim of this crime, Court held no error in denying change of venue); *Wooldridge v. State,* 659 P.2d 943, 945 (Okl.Cr.1983) (Despite evidence of rumor and gossip in Beaver County over rape prosecution; evidence four hundred Beaver County residents had signed a petition expressing that they wanted a town where they could feel safe from anyone who might harm their little girls; and evidence of a study of jurors' attitudes in Beaver County showing 55% of those surveyed said they had formed an opinion as to Wooldridge's guilt or innocence but 50% of those surveyed believed Appellant could receive a fair trial; and evidence that while most people will respond with a socially acceptable answer in a publicly expressed opinion, they may still harbor private attitudes and opinions regarding the guilt or innocence of a defendant; Court held no error in denying motion for change of venue). We do so again.

Having determined that a change of venue, even if properly presented, would in all probability not have been successful, we examine whether, even if one had been granted, Petitioner would have been assessed a penalty of life or life without parole. We have set out the evidence in aggravation below. Based on this evidence, we do not find error, and find it was not imposed under the influence of passion or prejudice.

### D.

 Petitioner also argues he should be allowed to withdraw his plea because he was misled by the trial court into believing he would get life without parole. This is not supported by the record.

Petitioner claims co-counsel Phil Hurst had a telephone conversation with the judge, who reportedly said he could not believe the prosecutor was not pleading out the case for a life without parole sentence, given the fact Petitioner was required to serve a total of 126 years on his sentences in New Mexico and Kansas before he would be eligible for parole. The judge also reportedly mentioned the economics of sentencing someone to death during the telephone conversation. Based on these comments, Petitioner claims he and his attorneys believed he would receive life without parole if he pled nolo contendere.

Other evidence weakens his argument, however. During the plea and sentencing hearings, no mention was made of this reported conversation, even though Petitioner was given an opportunity to speak. The transcript makes it clear Petitioner was told he could receive the death penalty, even on a plea of nolo contendere; and that the prosecutor would seek the death penalty on a plea (P Tr. 11). The judge also informed Petitioner what evidence must be presented before the court could consider the death penalty; and if the death penalty were assessed, an appeal would be automatic (P Tr. 12).

In addition to that evidence, Petitioner admitted on cross-examination during the hearing on his application to withdraw his plea his attorneys told him he would have a "fifty-fifty shot" of receiving life or life without parole, compared to only about a "ten percent shot" with a jury (WD Tr. 18). That Petitioner knew he could possibly receive the death penalty even after the purported telephone conversation between defense counsel and the judge—together with his admission he was aware of the possibility he could receive the death penalty (WD Tr. 21); his admission he "rolled the dice" and took his chances (WD Tr. 37); and the belief of counsel the judge was "more insulated from public opinion than a jury would be" (WD Tr.

48)—indicates he was not misled by anything that may have been said in that conversation.

It is this factual difference which renders Petitioner's sole authority on this point invalid. In *Porter v. State*, 58 Okl.Cr. 54, 49 P.2d 234 (1935), statements by the prosecutor actively misled the defense attorney to advise his client to plead guilty. Here, the prosecutor did not mislead Petitioner. Nor did the trial court. Nowhere did Petitioner allege the court promised a life without parole sentence on a guilty plea; indeed, there was no evidence at all to even indicate the court intended the private, *ex parte* conversation— even if made—to be taken as an indication of what the court would do if faced with a guilty plea. It is because there was no action by the State, either by the prosecutor or the court, that Petitioner's allegation here fails.[6]

The record before us indicates Petitioner relied on his attorneys' knowledge of the law,

and their instincts. That is not improper, and does not warrant allowing the plea to be withdrawn.

In *Brady v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970), the petitioner had been charged under federal statutes with kidnapping. He entered a knowing and voluntary plea of guilty. Nine years after the plea, the Court held federal provisions providing for the death penalty only upon the recommendation of the jury was unconstitutional. Based on this, Brady sought to withdraw his plea. The Court held the new ruling was of no avail to Brady. In addition the possibility that his plea might have been influenced by an erroneous assessment of the sentencing consequences if he had proceeded to trial did not render his plea invalid. The Court observed:

Often the decision to plead guilty is heavily influenced by the defendant's appraisal of

---

**6.** *Compare Ritter v. State*, 475 P.2d 407, 409 (Okl.Cr.1970) (When record showed the District Attorney, State Crime Bureau and other agencies negotiated with defendants through counsel and had strongly represented that the recommended punishment would be the maximum fine, Court found both parties mistaken in belief the trial court would undoubtedly follow the recommendation, and that defendants would not have entered pleas of guilty absent that mistaken belief; defendants allowed to withdraw pleas); *Manning v. State*, 374 P.2d 796, 798 (Okl.Cr.1962) (Sheriff tells family member she need not employ an attorney for defendant, and that prosecuting witness did not want to prosecute the Bogus Check charge, that the court would probably lecture the defendant and there would be no punishment whatsoever; allowed to withdraw plea) *with Allen v. State*, 747 P.2d 962, 963 (Okl.Cr.1987) (When record reflected petitioner admitted that the Public Defender did not guarantee him he would be given probation, and petitioner further stated that when he pled guilty, the trial court informed him that there was no promise that he would receive probation but that his sentence was dependent upon the pre-sentence investigation, Court held petitioner failed to show he entered his plea without full understanding of the consequences of his plea); *Miller v. State*, 492 P.2d 370, 373 (Okl.Cr.1971) (Defendant fully advised of rights, and when entered plea told court he did so of his own free will and as his voluntary act, and absent from threats, coercion, or promises, or expectancy of leniency. Denial of motion to withdraw plea affirmed); *Feldhausen v. Oklahoma City*, 481 P.2d 793, 794 (Okl.Cr. 1971) (When record reflected the defendant knew the prosecution's recommendation was not binding on the Court, and he did not seek to withdraw the guilty plea until sentence was pro-

nounced approximately one week later, defendant did not show sufficient grounds that the plea was unadvisedly entered. "A defendant who enters a plea of guilty with knowledge that the court is not bound by the recommendation by the prosecution may not later complain that the court did not follow the recommendation. To hold otherwise would seriously interfere with the orderly administration of justice."); *Seibert v. State*, 457 P.2d 790, 795 (Okl.Cr.1969) (When there was nothing in record to show defendant attempted to withdraw his plea of guilty, or that there was any undue influence or duress in securing his plea, Court found no reason to disturb the judgment and sentence); *Wellnitz v. Page*, 438 P.2d 301, 302 (Okl.Cr.1968) (Record did not support allegations defendant would receive 25 years instead of the 50 he received; evidence in mitigation of punishment was stipulated to by the State; court found pleas not induced by promise of leniency, as it was "abundantly clear that both parties understood that the trial court would independently determine the sentences to be imposed on the several pleas of guilty basing said sentences upon the evidence offered in aggravation and mitigation of punishment."); *Williams v. State*, 321 P.2d 990, 997 (Okl.Cr.1957), *aff'd*, 358 U.S. 576, 79 S.Ct. 421, 3 L.Ed.2d 516 (1958) (Noting the case was not the first capital case in which the death penalty has been imposed on a plea of guilty; citations given); *Id.* at 1003 (Powell, J., concurring) (Record showed the court was careful to question defendant as to whether he had been induced by any promise of leniency to change his plea, advised defendant that he might receive a death sentence, and defendant said that he understood that and wanted to waive the two days continuance for sentencing and have the sentence entered immediately; under the circumstances, judgment and sentence upheld).

the prosecution's case against him and by the apparent likelihood of securing leniency should a guilty plea be offered and accepted. Considerations like these frequently present imponderable questions for which there are no certain answers; judgments may be made that in the light of later events seem improvident, although they were perfectly sensible at the time. The rule that a plea must be intelligently made to be valid does not require that a plea be vulnerable to later attack if the defendant did not correctly assess every relevant factor entering into his decision. A defendant is not entitled to withdraw his plea merely because he discovers long after the plea has been accepted that his calculus misapprehended the quality of the State's case or the likely penalties attached to alternative courses of action....

*Id.*, 397 U.S. at 756–57, 90 S.Ct. at 1473. Similarly, the Court held in *McMann v. Richardson*, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970), that a counseled defendant may not make a collateral attack on a guilty plea on the allegation that he misjudged the admissibility of his confession. "Waiving trial entails the inherent risk that the good-faith evaluations of a reasonably competent attorney will turn out to be mistaken either as to the facts or as to what a court's judgment might be on given facts." *Id.* at 770, 90 S.Ct. at 1448. *See also Tollett v. Henderson*, 411 U.S. 258, 267–68, 93 S.Ct. 1602, 1608, 36 L.Ed.2d 235 (1973), where the Court observed:

The principal value of counsel to the accused in a criminal prosecution often does not lie in counsel's ability to recite a list of possible defenses in the abstract, nor in his ability, if time permitted, to amass a large quantum of factual data and inform the defendant of it. Counsel's concern is the faithful representation of the interest of his client and such representation frequently involves highly practical considerations as well as specialized knowledge of the law. Often the interests of the accused are not advanced by challenges that would only delay the inevitable date of prosecution, ... or by contesting all guilt.... A prospect of plea bargaining, the expectation or hope of a lesser sentence, or the convincing

nature of the evidence against the accused are considerations that might well suggest the advisability of a guilty plea without elaborate consideration of whether pleas in abatement, such as unconstitutional grand jury selection procedures, might be factually supported.

*Id.* (citations omitted). *See also Wellnitz v. Page*, 420 F.2d 935, 936–37 (10th Cir.1970) (While a reckless promise by counsel may necessitate relief, an attorney may offer a prediction, "based upon his experience or instinct," of the sentence possibilities a defendant should weigh in determining upon a plea. "An erroneous sentence estimate by defense counsel does not render a plea involuntary. And a defendant's erroneous expectation, based on his attorney's erroneous estimate, likewise does not render a plea involuntary." (citations omitted)).

Accordingly, this subproposition is without merit.

### E.

Petitioner also claims his plea was invalid because he did not voluntarily and intelligently waive his right to a trial by a fair and impartial jury. For the reasons given above, this is without merit. Petitioner has failed to show that a change of venue would have been successful; or, if it had, the outcome would have been different, given the overwhelming evidence against him. Additionally, the record before this Court shows the trial court painstakingly inquired of Petitioner as to all his rights, and that Petitioner waived each and every right afforded to him, including the right to a trial by jury.

### F.

For the reasons stated above, we find that, even if his attorney had properly lodged his motion for change of venue, the outcome of the proceedings would have not changed. Accordingly, we find no merit to Petitioner's second proposition of error.

### IV.

For his third proposition, Petitioner argues there was insufficient evidence to support

two aggravating circumstances: the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution; and the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. Petitioner does not contest the evidence in support of the aggravating circumstance he knowingly created a great risk of death to others. We shall address them in that order.

### A.

■■■■ Concerning the aggravating circumstance the murder was committed to avoid a lawful arrest or prosecution, Petitioner is correct in stating this Court requires more evidence than simply showing a potential witness was killed during a robbery. The prosecution must prove evidence of the defendant's intent at the time of the murder. *Stouffer v. State,* 738 P.2d 1349, 1361–62 (Okl.Cr.), *cert. denied,* 484 U.S. 1036, 108 S.Ct. 763, 98 L.Ed.2d 779 (1987); *Banks v. State,* 701 P.2d 418, 426 (Okl.Cr.1985). That intent can be inferred from circumstantial evidence, in absence of defendant's own statements of intent. *Williamson v. State,* 812 P.2d 384, 406–07 (Okl.Cr.1991), *cert. denied,* 503 U.S. 973, 112 S.Ct. 1592, 118 L.Ed.2d 308 (1992). In addition, there must be a predicate crime which provides the basis for the murder to avoid arrest or prosecution. *Barnett v. State,* 853 P.2d 226, 233 (Okl.Cr.1993). Here, evidence can be seen in the evidence of the flower shop homicide itself, even without the evidence of murders in other states.

After Petitioner obtained the money from the shop's cash register, he was ordering the shop workers into the back room when Ms. Manning came in through the shop's front door. At that point, Petitioner hesitated, then told Ms. Beane to call the customer to the rear of the store. Ms. Beane implored him not to have her called back there, as there was no evidence she knew Petitioner was there. In response, Petitioner momentarily hesitated "as if this was a thought" (S.Tr. 16). He quickly changed his mind, however, ordering the woman back. In the light most favorable to the prosecution,

*Brown,* 871 P.2d at 76, this shows he did not want to be detected by someone else after the robbery, or run the risk the sounds of gunshots would draw attention from someone in the front of the store.

Petitioner argues the evidence by his psychological experts shows he wanted to kill the women to experience some kind of emotional or psychological release; and it was this, not to avoid arrest or prosecution, which was the motive for the murder. Even if this were true, it does not preclude the likelihood he killed to avoid arrest for the robberies. Had Petitioner been caught, he would be unable to kill again and would be unable to attain the emotional release he points to on appeal.

This subproposition is without merit.

### B.

■■ Petitioner next argues there was insufficient evidence to support the court's finding there existed a probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society. Petitioner acknowledges the murder not only in Oklahoma, but also two in Kansas and one in New Mexico. He argues his four life sentences (together with an additional consecutive 30 years) in Kansas, which will run consecutive not only to the life (and 15–year) sentence in New Mexico but also to each other, preclude the possibility of his ever being a threat to the citizens of Oklahoma.

There is also evidence—presented by Petitioner himself—that he suffers from a severe borderline personality (or even antisocial personality) disorder, a disorder for which there is no cure but only therapy to lessen its effects. Petitioner points to evidence his experts said there was a possibility the disorder's effects would lessen over time. These same experts also admitted there was a possibility Petitioner would be dangerous for the rest of his life, even with treatment. Moreover, the evidence showed there was no way to accurately predict when his outbursts would occur.

Petitioner acknowledges the disorder, but argues it should be viewed as mitigation, not

evidence in aggravation. We need not draw a "bright line" on the use of this evidence, as Petitioner urges; because in addition to this disorder, the evidence showed Petitioner harbored a deep-seated bitterness and hostility toward authority figures. This makes him a danger not only to other inmates, but also prison officials and employees. This was re-enforced by evidence showing that, even while incarcerated and therefore not likely on illicit drugs or alcohol, Petitioner had assaulted a guard in the New Mexico prison system; and Kansas officials twice found homemade weapons in his jail cell.

We have previously held "society" can apply to a prison population. *See Berget v. State*, 824 P.2d 364, 374 (Okl.Cr.1991), *cert. denied*, 506 U.S. 841, 113 S.Ct. 124, 121 L.Ed.2d 79 (1992); *see also Brown*, 871 P.2d at 77 n. 9 ("[W]e are not able to ascertain how many others in society Appellant could threaten should they become an irritant to him. It is the attitude and actions of Appellant himself, not the number of people threatened, which determines whether he might commit future acts of violence and be a threat to society.") And despite Petitioner's assertions to the contrary, there does exist the possibility, however small, Petitioner could one day be returned to Oklahoma even if his death sentence were to be set aside. This possibility, together with his past crimes and his attitude toward authority figures, more than amply supports the court's finding Petitioner would be a continuing threat to society.

In light of our holding, we need not address Petitioner's third subproposition, that there is insufficient evidence in aggravation to survive reweighing.

This proposition is without merit.

### V.

Petitioner alleges in his fourth proposition of error the aggravator that the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution has been interpreted in an unconstitutionally vague manner. We have previously held this aggravating circumstance requires that there be a predicate crime, separate from the murder, for which the appellant seeks to avoid arrest or prosecution. *Barnett*, 853 P.2d at 233. There, we explained:

> [W]here such crimes are not separate and distinct from the murder itself, but rather significantly contribute to the death, they may not be used as the predicate crime for purposes of this aggravating circumstance. To hold otherwise would undermine the clear purpose of this aggravating circumstance.

*Id.* at 234. *See also Castro v. State*, 844 P.2d 159, 175 (Okl.Cr.1992), *cert. denied*, —— U.S. ——, 114 S.Ct. 135, 126 L.Ed.2d 98 (1993), where we held our interpretation of this aggravating circumstance was not unconstitutional.

This proposition is without merit.

### VI.

Appellant next contends the aggravating circumstance of continuing threat is constitutionally vague and overbroad. We have repeatedly addressed this complaint and have repeatedly found it lacking. *See Brown*, 871 P.2d at 73, and cases cited therein. We do so again. This fifth proposition is wholly without merit.

### VII.

In his sixth proposition, Petitioner contends his death sentence must be vacated because the "great risk of death" aggravating circumstance [7] is being interpreted in an unconstitutional manner.

Petitioner concedes this issue has been addressed and disposed of in the past. *See Cartwright v. Maynard*, 802 F.2d 1203, 1221–22 (10th Cir.1986), *rev'd on other grounds on rehg.*, 822 F.2d 1477, *aff'd*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), and cases cited therein; *see also Smith v. State*, 727 P.2d 1366, 1373 (Okl.Cr.1986), *cert. denied*, 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 780 (1987) ("We hold that the evidence is sufficient to support the aggravating circum-

---

**7.** That statutory aggravating circumstance reads: "The defendant knowingly created a great risk of death to more than one person." 21 O.S.1981, § 701.12(2).

stance of knowingly creating a great risk of death to more than one person where a defendant during the continuing course of conduct in which a murder is committed, threatens the life of another and has the apparent ability and means of taking that person's life."); *Burrows v. State*, 640 P.2d 533, 543, 553 (Okl.Cr.1982), *cert. denied*, 460 U.S. 1011, 103 S.Ct. 1250, 75 L.Ed.2d 480 (1983) (Cornish, J., with whom Brett, J., concurs in part and dissents in part). He nonetheless invites us to reconsider that holding. We decline to do so.

## MANDATORY SENTENCE REVIEW

This Court is required by 21 O.S.1991, § 701.13(C) to determine whether (1) the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the evidence supports the factfinder's finding of aggravating circumstances as enumerated in 21 O.S.1981, § 701.12. Pursuant to this mandate, we shall first determine whether the evidence was sufficient to support the imposition of the death penalty.

The court found the existence of three aggravating circumstances: that Petitioner knowingly created great risk of death to more than one person (21 O.S.1981, § 701.12(2)); the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution (21 O.S.1981, § 701.12(5)); and the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society (21 O.S.1981, § 701.12(7)). The court did not find a fourth aggravating circumstance alleged: that Petitioner was previously convicted of felony involving use of threat or violence to person (21 O.S.1981, § 701.12(1)).

We have discussed the evidence supporting the arrest-or-prosecution and continuing threat aggravators in section IV, above. We noted there the evidence more than amply supported the finding of both of those aggravators.

■ Concerning the aggravating circumstance that Petitioner knowingly created a great risk of death to more than one person, there is sufficient evidence to support that allegation as well. Jo Ann Beane testified that Petitioner forced not only the victim, but also herself and customer Mary Manning into the back room of the flower shop, ordered all three to lie on the floor, and shot each in the back of the head. Had Ms. Beane not been able to maintain consciousness and call for help, it is likely she and Ms. Manning would also have died. *Stafford v. State*, 832 P.2d 20, 23 (Okl.Cr.1992), *aff'd*, 853 P.2d 223 (1993); *Cartwright v. State*, 695 P.2d 548, 555 (Okl.Cr.), *cert. denied*, 473 U.S. 911, 105 S.Ct. 3538, 87 L.Ed.2d 661 (1985), *overruled on other grounds*, *Cartwright v. Maynard*, on rehearing 822 F.2d 1477 (10th Cir.1987), *aff'd* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). In the light most favorable to the prosecution, *Brown*, 871 P.2d at 76, there is sufficient evidence to support this aggravating circumstance.

As mitigation Petitioner presented evidence showing he had suffered from Borderline Personality Disorder since childhood; he received little or no support from his family while growing up; his parents, both of whom had serious alcohol problems, had a bitter divorce while Petitioner was a teenager; he had ingested large amounts of cocaine and alcohol before committing the murders; Petitioner generally had adjusted satisfactorily to institutional life since he had been incarcerated; he exhibited deep remorse for his crimes; and although Petitioner's personality disorder cannot be cured *per se*, it would likely mellow over time, rendering him less of a threat.

We agree with the trial court these mitigating factors do not outweigh the aggravating circumstances found.

## MOTION TO RECONSIDER SUPPLEMENTAL BRIEF

Petitioner previously had filed an application to allow a supplemental brief containing a new proposition of error, based on *Pickens v. State*, 885 P.2d 678 (Okl.Cr.1994). We denied that application on March 14, 1995, as the discussion in *Pickens* dealing with wording of an information was not an issue of first

impression, but was based on pre-existing caselaw.

Petitioner on April 11, 1995, filed what is styled a "Motion to Reconsider Order Denying Motion to File Supplemental Brief," asking this Court to reconsider its March 14 Order. We feel that order was complete and self-explanatory, and shall not revisit the issue. Accordingly, Petitioner's April 11 motion to reconsider is hereby **DENIED.**

### DECISION

Finding no error warranting reversal or modification, the judgments and sentences of the trial court for Murder in the First Degree, two counts of Shooting with Intent to Kill; and two counts of Robbery with Firearms in Carter County Cause No. CRF–89–332 are **AFFIRMED.** Petitioner's April 11, 1995, Motion to Reconsider our March 14, 1995, order denying Petitioner's request to file a supplemental brief containing a new proposition of error is **DENIED.**

JOHNSON, P.J., and LANE and STRUBHAR, JJ., concur.

CHAPEL, V.P.J., concurs in result.